**Scott Thomas MORRO, Plaintiff**

v.

**CITY OF BIRMINGHAM, Defendant.**

Civil Action No. 92–AR–2339–S.

United States District Court,
N.D. Alabama,
Southern Division.

April 12, 1996.
Addendum to Opinion April 17, 1996.

William M. Dawson, Jr., Dawson & Gear, Birmingham, AL, M. Clay Ragsdale, IV, and

E. Ansel Strickland, Jr., Birmingham, AL, for plaintiff.

Thomas Bentley, III, John M. Edens, Demetrius C. Newton, and Michael M. Fliegel, Birmingham City Attorney's Office, Birmingham, AL, for defendant.

## MEMORANDUM OPINION

ACKER, District Judge.

This case began on October 2, 1992, with a complaint filed by Scott Morro ("Morro"), a policeman for the City of Birmingham ("City"), against the City and Arthur Deutcsh ("Chief"), individually and in his official capacity as Chief of Police of the City. Morro's amended complaint, trimmed of some of the particulars required by the court, charged that the Chief suspended him without pay as punishment for his having attended the trial of Erica Arrington, the daughter of the City's Mayor, as an expression of solidarity with his fellow patrolman, Jerry Bahakel, who had arrested Ms. Arrington. The arrest of Ms. Arrington was a highly publicized and controversial event. Ms. Arrington was acquitted in City court. Bahakel was fired by the Chief. The Chief was subsequently indicted and convicted of tampering with Ms. Arrington's arrest records.

Morro, apparently anticipating a defense based on *Monell v. Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), circumvented it by alleging that the ultimate policymaker for the City in matters of police discipline was the Chief. In this regard Morro invoked the line of cases that includes *Pembaur v. City of Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), and *City of St. Louis v. Praprotnik,* 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988).

After this court denied motions for summary judgment filed by defendants, they filed a joint notice of appeal to the Eleventh Circuit. The only defendant who had the right to an automatic interlocutory appeal was the Chief in his individual capacity, based on his defense of qualified immunity. A *per curiam* unpublished opinion of the Eleventh Circuit issued on October 19, 1994,

agreed with the Chief's qualified immunity defense and held:

> Given the undisputed facts on Morro's lack of preparedness for court, it was objectively reasonable to discipline Morro.

When the subsequent mandate was received by this court, the earlier order denying the Chief's motion for summary judgment in his individual capacity was vacated, and the action as against the Chief individually was dismissed with prejudice.

The "undisputed facts on Morro's lack of unpreparedness" included a dispute as to whether Morro had a legitimate excuse for not being able to identify a particular culprit where two arrests had been made separately but contemporaneously during a neighborhood disturbance. The two arrests were separately effected by a pair of patrolmen, one of whom was Morro. Morro's attention at the time of the dual arrests was arguably focused on the subject whom he chased and cuffed and not on the other arrestee who was taken into custody by his fellow officer. Both officers were subpoenaed for the misdemeanor trials of the two persons arrested. Morro's subject pled guilty. The other officer was able to identify the person who pled "not guilty," namely, the one he cuffed, and that person was found guilty without the benefit of any testimony from Morro, who, after telling the prosecutor that he could not identify that person, was told by the prosecutor to go home. If Morro is at all credible, it would be just as logical to describe him as "truthful" and "careful not to commit perjury" as it would be to describe him, as the Chief did, as "unprepared to testify." In any event, the Chief, who was himself under investigation for alleged records tampering, signed the charge of unpreparedness developed against Morro by "internal affairs." It was the first such charge ever made against a policeman in the known history of the City. The complaint against Morro originated with the City judge who had found Ms. Arrington "not guilty" while Morro was sitting on the front row of her full courtroom, and who a few days later found the miscreant guilty despite her subsequent conclusion that Morro was "unprepared" to testify against him.

The Chief, in his capacity as the principal executive officer of the Police Department, conducted a hearing on his charge against Morro. The Chief then made the decision to suspend Morro for 30 days without pay. For the purposes of a "qualified immunity" analysis, the Chief's action, as found by the Eleventh Circuit, was "objectively reasonable," in that it was within the realm of logic, but the question clearly remained as to whether the Chief's true motive was something other than what was characterized as Morro's "unpreparedness." Morro appealed his suspension to the Personnel Board of Jefferson County, which, after a *de novo* hearing by a hearing officer, reversed the Chief's decision and reinstated Morro with pay. In other words, the Personnel Board, which considered virtually the same evidence that the jury in this case eventually heard, agreed in advance with the jury, and either rejected the objectively reasonable conclusion that Morro was "unprepared" or found that the charge of "being unprepared" was simply a pretext for making Morro an example of what can happen to an officer who engages in symbolic speech against the personal interests of the Chief and/or the Mayor on a matter of public interest and concern.

On February 27, 1995, after the Eleventh Circuit had eliminated the action as against the Chief individually, the City and the Chief in his official capacity renewed their motion for summary judgment. The renewed motion added the following grounds:

> 1. The United States Court of Appeals has ruled as a matter of fact that the evidence in this cause shows indisputably that plaintiff was unprepared for court.
>
> 2. The United States Court of Appeals has also ruled that based upon plaintiff's unpreparedness it was objectively reasonable to discipline plaintiff.
>
> 3. The claims plaintiff has alleged against these defendants are based upon these defendants disciplining him for violating a departmental rule of the Birmingham Police Department. That rule in effect required plaintiff and other officers to be prepared to prosecute cases in which they are involved.

4. If the fact of plaintiff's unpreparedness has been determined against him there does not remain in this case a genuine dispute as to the facts which plaintiff alleges are the basis of the wrong done him by the defendants.

5. The fact established in this case by the Court of Appeals ruling means as a matter of law and fact that the disciplining of plaintiff does not proceed from an unconstitutional practice or policy to violate the rights of plaintiff or of any other person. It is not unconstitutional policy to discipline personnel for actual violation of rules.

6. *Defendant Deutcsh was at the time of his decision to impose discipline upon the plaintiff the Chief of the Birmingham Police Department. As such he was entitled to and obligated to discipline employees of the department such as plaintiff for actual violations of the rules of the department. The ruling of the Court of Appeals has established that plaintiff was in violation of those rules in that he was unprepared for court and that was the basis for his discipline.*

(emphasis supplied).

### The Belated Monell Defense

Neither defendants' original answer to the amended complaint nor defendants' statement of position in the pre-trial order contains an assertion by the City that the Chief was not the City's final policymaker holding a position that could render the City liable pursuant to 42 U.S.C. § 1983 if, operating as such, the Chief deliberately violated an employee's First Amendment right. At the pre-trial conference, and throughout the case, there was never any insistence by the City on a *Monell* defense. The closest thing to such a defense was affirmative defense No. 31 contained in the City's answer: "Plaintiff fails to state a claim against the defendant, the City of Birmingham, for which he is entitled to relief." The City went so far as to interpose the so-called *Mt. Healthy* defense, which presupposed a violation by the City of Morro's First Amendment freedom of expression.

■ On May 23, 1995, this court denied defendants' renewed motion for summary judgment. Thereupon, the City and the Chief in his official capacity formally requested this court to certify that ruling for an interlocutory review by the Eleventh Circuit pursuant to 28 U.S.C. § 1292(b). The court promptly honored their request, recognizing that a successful appeal of the denial of the renewed motion for summary judgment would be dispositive. The Eleventh Circuit agreed, because on June 2, 1995, it granted defendants' petition for permission to appeal. However, on July 25, 1995, the Eleventh Circuit entered an order dismissing defendants' said appeal "for want of prosecution." A dismissal for want of prosecution is a dismissal *with prejudice*. This particular dismissal constituted an adjudication against the City on the merits of its appeal, establishing as a matter of law that the undisputed facts as found by this court were sufficient to make out Morro's *prima facie* case. When the City took its appeal it had every factual or legal basis for a *Monell* defense that it had when it later moved for a dismissal under Rule 50(a). There is no escaping the conclusion that the existence of a *prima facie* case became the law of the case at the moment defendants' permitted appeal was dismissed. An appeal is nothing more than a complaint addressed to an appellate court. When such a complaint is dismissed with prejudice, the preclusive effect is identical to that occasioned by the dismissal by a *nisi prius* court of an action in that court.

After the dismissal of defendants' second appeal, the case came on for jury trial, during which the evidence consisted of everything that could easily be predicted, that is, except for testimony by Morro of forms of harassment that continued after the Personnel Board's ruling in his favor. There were no real surprises. Consistent with the pleadings and the pre-trial order, defendants made no contention during opening statement, or by any offer of evidence, either (1) that as a matter of police governance Morro could be summarily disciplined for attending a public trial, or (2) that the Chief was not the *alter ego* of the City, or, in other words, that the Chief was not the City's ultimate decision-maker insofar as administering discipline to police personnel. Before the case went to

the jury, the City and the Chief agreed to Morro's dismissal of his action as against the Chief in his official capacity. This move came after a colloquy with the court, during which the court, and, ostensibly, counsel for Morro, were given every reason to believe that the City was reaffirming its concession that the Chief *was*, for all intents and purposes, the City for the purpose of establishing its § 1983 liability, that is, if the jury chose to believe that the Chief intended to punish Morro for attending the trial of Ms. Arrington. Neither a *Monell* defense nor a *Mt. Healthy* defense was ever a real issue, and no jury instruction was given as to either of them. The Chief was quite properly dismissed as a redundant defendant.

There was ample evidence of a motive by the Chief to punish Morro as a means of stopping a potential rank-and-file protest against the Chief and the Mayor in the Erica Arrington affair. Morro had a plausible explanation for his being "unprepared" in City court. His explanation, as has already been pointed out, was apparently accepted both by the Personnel Board and by the jury, which rendered a verdict in favor of Morro and against the City for $150,000.00, necessarily representing a finding that Morro proximately sustained substantial injury in the form of mental anguish. The City does not claim that this sum is excessive.

Not only was there evidence upon which the Chief's articulated motivation could be questioned, but even after Morro's exoneration by the Personnel Board, Morro's job assignments have been such as to suggest that he continues to be disparately treated by the "powers-that-be" within the Police Department. For instance, Morro still answers to the sergeant who, by appointment of the Chief, vigorously conducted the investigation of Morro's alleged "unpreparedness," and who, in effect, prosecuted him at the hearing before the Chief, and who was the chief witness against him before the Personnel Board and before the jury. Morro has even been forced to undergo psychiatric counseling, which he may or may not have needed.

When Morro rested his case-in-chief, defendants filed a motion for judgment as a matter of law pursuant to Rule 50(a), F.R.Civ.P. Defendants did not argue that there had been insufficient evidence introduced to support plaintiff's proposition that the Chief was the final decision-maker for the City for the purposes of satisfying *Monell* and establishing municipal liability. Had defendants made such an argument at that time, the court (1) *might* have held that defendants were precluded by judicial estoppel or by Rule 16(e) and the pre-trial order, (2) *might* have allowed Morro to reopen, or (3) *might* have undertaken legal research that had not therefore been undertaken because the court had not been presented with a need to do so. The court denied the said Rule 50(a) motion, finding that Morro had made out his *prima facie* case, and that a reasonable jury, with the responsibility for factfinding and for making credibility determinations, had before it ample evidence, including implicit concessions, upon which it could find for Morro by finding that the Chief was the City's decision-maker and transgressed the First Amendment guarantee of freedom of expression.

The evidence subsequently offered by defendants can fairly be described as being equally supportive of plaintiff's allegations and of defendants' defense of a legitimate, reasonable, constitutional reason for having disciplined Morro. Defendants not only abandoned their *Mt. Healthy* defense, but never offered any evidence in support of a *Monell* defense. It was only *after* Morro dismissed his action as against the Chief and *after* the court had orally announced its intention to deny the City's final Rule 50(a) motion that the City insisted on arguing a *Monell* defense. As the court was about to charge the jury, the City, for the first time, sought to insist that the Chief was not the final arbiter of police discipline, and instead that the Personnel Board was that final arbiter, thus mounting a *Monell* defense. The City was suddenly, at the last minute, arguing either that the Personnel Board (which had agreed with Morro) should be Morro's target, or that he had no § 1983 remedy whatsoever.

After the jury rendered its verdict and judgment was entered against the City, the

court expressly reserved the right to expand upon its orally stated reasons for denying the City's Rule 50(a) motion. The City then filed its current motion for judgment pursuant to Rule 50(b), arguing several grounds, including the repeated contention that the Chief did not have binding authority for § 1983 purposes, but perhaps that the Mayor did, if not the Personnel Board. If at trial the City had contended that the Mayor constituted the City's final decider in the premises, as it now suggests for the first time, the can of worms would have overflowed. The interrelationships between the Mayor, his daughter, the Chief, and the City judge appointed by the Mayor would have made for a more interesting jury case than even this one was. In fact, there was no evidence whatsoever to suggest that the Mayor participated in the decision to discipline Morro, or that he had the authority to do so. There was, of course, the law, and a belated argument based on that law, that the Personnel Board was the final arbiter of police discipline. When that argument first surfaced just before closing arguments, this court pointed out that to allow the City, as an absolute defense, to rely upon the fact that a disciplined policeman can appeal to the Personnel Board would create impenetrable insulation for a Chief's purposeful violation of the constitutional right of a policeman, no matter how egregious that violation, and would render 42 U.S.C. § 1983 meaningless under circumstances like these.

Furthermore, the Personnel Board is an entity entirely separate from the City. It has responsibilities for personnel matters involving many other municipalities within Jefferson County, as well as for Jefferson County itself. Even more important is the law of Alabama that distinguishes the way the Personnel Board of Jefferson County operates from the way other personnel boards in Alabama, Florida and Georgia operate. Section 22 of Act No. 2482 of the Legislature of Alabama of 1945 (a general act of local application to Jefferson County), as amended by Act No. 562 of the Legislature of Alabama of 1947, by Act No. 670 of the Legislature of Alabama of 1953, by Act No. 1600 of the Legislature of Alabama of 1971, and by Act No. 679 of the Legislature of Alabama of 1977, provides:

*Dismissal, Demotions and Suspension.* An appointing authority may dismiss or demote an employee holding permanent status for just cause whenever he considers the good of the service will be served thereby, for reason stated in writing, served on the affected employee, and a copy furnished to the Director, which action shall become a public record. The dismissed or demoted employee may within ten days after notice, appeal from the action of the appointing authority by filing with the Board and the appointing authority a written answer to the charges. The Board must order a public hearing of such charges, and if the Board finds the employee not guilty, the Board shall order the reinstatement of the employee under such conditions as the Board may determine. If the Board finds the employee guilty, the Board shall determine whether the employee shall be dismissed, demoted, suspended, or otherwise disciplined. In addition to removal or demotion by an appointing authority, an employee may be re-*moved, demoted, suspended or otherwise* disciplined in the following manner. Charges may be filed by any officer, citizen or taxpayer of the State with the *Director* who shall within five days cause a copy to be served upon the person complained against and shall set a day not more than twenty days after such charges have been served on such employee for a public hearing of such charges. This hearing may be before the Director, a special agent appointed for the purpose by the Director, or the Board itself. If before the Director or a special agent, the Director or special agent shall take testimony offered in support and denial of such charges and from the same submit to the Board, within five days, a finding of facts and law involved and a recommended decision. The Board at its next regular or special meeting shall consider said report and modify, alter, set aside or affirm said report and certify its findings to the appointing authority who shall forthwith put the same into effect. If the Board hears said charges directly or requires the transcribing and submission of the testimony taken

before the Director or special agent, it shall make up and file its own findings and decision. An employee may also be removed, demoted, suspended or otherwise disciplined upon charges made by the Director and referred to the Board based upon investigation conducted upon his own initiative or upon complaints referred to the Director by a member of the Personnel Board when the Director after such investigation shall be reasonably satisfied that such charges are warranted. Charges preferred by the Director shall be served and a public hearing held by the Board within the time and in the manner prescribed where charges are preferred by an officer, citizen or taxpayer of this State. Any interested party at such hearing may be represented by counsel. All proceedings at the hearing shall be recorded by a competent stenographer or mechanical recording device. *The decision of the Board based upon all proceedings before the Board shall be final subject to appeal by either party to the Circuit Court to review questions of law and the question of whether or not the decision or order of the Board is supported by the substantial and legal evidence.* On such appeal the Circuit Court shall review the record and shall affirm, reverse, remand or render said cause. The decision of the Board shall be controlling until reversed on appeal as provided for herein. *The appeal shall be perfected by filing with the Director of Personnel a statement in writing signed by the party appealing to the effect that said party appeals from the decision or order of the Personnel Board to the Circuit Court, which statement shall be filed within ten days from the announcement of the decision or order of the Personnel Board; provided further, that the party taking an appeal shall file with the Clerk of the Circuit Court, security for costs in an amount approved by any judge or said Circuit Court, which security for cost may consist of a cash deposit or a bond executed by such party appellant and a surety or sureties approved by the said Circuit Clerk.* Such security for costs shall be filed by the party taking the appeal within ten days from the announcement of the

decision or order of the Personnel Board. Within ten days from the filing of such statement of appeal the Director of Personnel shall forward to the Circuit Clerk the original or copies of charges preferred and the answer filed to such charges and a complete transcript of all the proceedings before the Personnel Board at such hearing. In the event the Director is unable to complete such transcript of all the proceedings within ten days, the Presiding Judge of the Circuit Court shall allow the Director such additional time as may be necessary to do so. In the event copies of said charges and answer are forwarded to the Circuit Clerk instead of the originals, the Director of Personnel shall certify that such copies are true and correct copies of the originals. The Personnel Board shall make no charge for furnishing the copy of the record required by the Circuit Court.

*Upon receipt of said papers the Circuit Clerk shall present the same to the Presiding Judge of the Circuit Court or the Circuit Judge sitting in place of the Presiding Judge if the regular Presiding Judge be absent; and the Presiding Judge or the Judge sitting in his absence shall assign the case so appealed to three Circuit Judges of said Circuit who shall jointly review the record of the hearing before the Personnel Board.* The Presiding Judge or the Judge sitting in his absence in the order assigning such case for review shall designate one of the three Judges to whom the case is assigned as Presiding Judge of such panel. Any such appeal shall be considered and determined as a preferred case in the Circuit Court. The opinion of a majority of three judges to whom such case is assigned shall be determinative of the case and there shall be no appeal to any appellate court of Alabama. The cost of said appeal shall be taxed against the unsuccessful party. If any employee shall wilfully refuse or fail to appear before any Board or body authorized to conduct any hearing or inquiry, or having appeared shall refuse to testify or answer any question relating to the affairs of government or the conduct of any officer or employee on the ground that his testimony or answers would tend to incriminate him, or

shall refuse to waive immunity from prosecution on account of any matter about which he may be asked to testify and shall not be eligible for appointment to any position under the jurisdiction of this Act. An appointing authority may, from time to time, peremptorily suspend any employee without pay or other compensation, and without the right of a hearing, as punishment for improper behavior, but any one suspension shall not exceed five days and the total suspension by such appointing authority of such person shall not exceed ten days in any year of service. Such suspension with loss of pay may be effected only by service upon the employee by the appointing authority of written charges setting out clearly the delinquency for which such suspension was made, a copy of which must be at the same time mailed or delivered to the Director. The suspended employee shall have the right to file with the Board and the appointing authority a written answer or explanation of such charges. Any employee suspended without right to a hearing before the Board may obtain a review of his or her suspension by the appointing authority by filing with the appointing authority not more than ten days thereafter a written answer to such charges and a request for such review. A hearing shall be held thereon not more than twenty days thereafter to determine whether such suspension should be rescinded. At any such hearing such employee may be represented by counsel and present relevant testimony. The appointing authority may authorize a representative to conduct such hearing and submit within five days thereafter a finding of facts and law together with recommendations to the appointing authority. Within a period of ten days after such hearing the appointing authority may rescind all or any part of such suspension. A suspended employee shall be entitled to full salary for any period of suspension rescinded hereunder.

(emphasis supplied). Not only did Morro have a right to appeal to a three-judge court if the Personnel Board had decided against him, but, despite the provision in Section 22 to the contrary, there would have been a limited review of the three-judge panel's decision to the Court of Civil Appeals of Alabama. *See Ex parte Personnel Bd. of Jefferson County*, 440 So.2d 1106 (Ala.Civ.App. 1983). In other words, if the employee victim of a constitutional tort in the form of wrongfully administered discipline is limited to a § 1983 complaint against the ultimate possible decider on the matter of discipline, a § 1983 defendant in cases arising in Jefferson County would have to be the Circuit Court of Jefferson County (or a three-judge panel thereof), or the Court of Civil Appeals. This is far from what § 1983 intended.

■ At the late stage at which the City attempted to raise *Monell*, it was judicially estopped from contending that the Chief was not lawfully assigned the binding responsibility for administering discipline within his Department. In its above-quoted second motion for summary judgment, the City plainly said:

Defendant Deutcsh was at the time of his decision to impose discipline upon the plaintiff the Chief of the Birmingham Police Department. As such he was entitled to and obligated to discipline employees of the department such as plaintiff. . . . .

If this court or plaintiff's counsel had been seriously faced earlier with a contention by the City that the Chief's authority did not provide Morro his way around *Monell*, the court would not only have more carefully studied *Pembaur* and *Praprotnik* but would have carefully read *Jett v. Dallas Independent School Dist.*, 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989), and would certainly have discovered *Hill v. Clifton*, 74 F.3d 1150 (11th Cir.1996), decided only a month before the instant case went to trial. The City did not even mention *Hill v. Clifton* until its post-judgment motion.

An excellent, and still valid, statement of the principle of judicial estoppel is found in *Texas Co. v. Gulf Refining Co.*, 26 F.2d 394, 397 (5th Cir.1928), *cert. denied*, 278 U.S. 625, 49 S.Ct. 27, 73 L.Ed. 545 (1928), as follows:

A party, who in litigation with his adversary has, with knowledge of the facts, asserted a particular claim, title, or right, cannot afterward assume a position incon-

sistent with such claim, to the prejudice of the same adversary, who has acted in reliance on such claim being as it was previously made; in other words, a party who, for the purpose of maintaining his position in litigation, has deliberately represented a thing in one respect, is estopped to contradict his own representation by giving the same thing another aspect in litigation with the same adversary as to the same subject-matter. *Ohio & Miss. Ry. Co. v. McCarthy*, 96 U.S. [ (6 Otto) ] 258, 24 L.Ed. 693[ (1877) ].

\* \* \* \* \* \*

From the beginning appellant had knowledge of the facts upon which it bases the claim asserted in this suit. Notwithstanding its possession of that knowledge, for more than nine years it refrained from making the claim now asserted, in the meantime so conducting itself as to conceal from appellee even the probability or possibility of such a claim being made....

While the City in the instant case did not conceal its *Monell* defense for nine years as was done in *Texas Co.*, the City did successfully conceal it for four years. In the instant case there was no reason or inducement for Morro to develop or to present evidence to support his *Pembaur* or *Praprotnik* theory. Thus, the city created the basis for judicial estoppel.

Rule 16(e), F.R.Civ.P., provides that the final pre-trial order "shall control the subsequent course of the action unless modified by subsequent order," and that that order "shall be modified only to prevent manifest injustice." The City never requested a modification of the pre-trial order to inject a *Monell* defense. This procedural fact renders academic the question of whether the court could have made such a modification at the last minute without *causing* manifest injustice in contrast to *preventing* it.

■ Assuming *arguendo* (1) that the City is not estopped by its implicit concession that the Chief had the City's final policymaking power as to the subject at hand; and (2) that the issue of the Chief's authority was not finally adjudicated against the City by the dismissal with prejudice of its most recent appeal to the Eleventh Circuit, the *Monell* question is still answered in favor of Morro by the evidence. First, the apparent reason for bringing up for the first time the Mayor as the final policymaker vis-a-vis Morro is to try to bring this case in alignment with the very recent decision of *Hill v. Clifton.* There, the city manager and not the police chief was found to have final authority to take disciplinary action against police personnel, thus heading off the *Pembaur* and *Praprotnik* approach. As distinguished from *Hill v. Clifton,* there was no evidence whatsoever in the instant case that the City's Mayor could have disciplined Morro. If the Mayor participated in the decision, that participation remains undiscovered, and the court finds no reason whatsoever to think that the Mayor was ever anything but a chagrined and interested father. Furthermore, the City overlooks or misstates the Personnel Board's role as an actor. The Personnel Board of Jefferson County is not an actor, but a reactor. The actor was Chief Deutcsh. The existence of the Personnel Board as a means of review only provided Morro an expanded opportunity to obtain "due process." He is not complaining of a denial of "due process." If the fact that the Personnel Board had the right to overrule the Chief makes the Personnel Board the *Monell* policymaker for the City, the City overlooks, either deliberately or mistakenly, the significant differences between *this* personnel board and *other* personnel boards within the territorial jurisdiction of the Eleventh Circuit. Lastly, the City by credible evidence of continued disparate treatment of Morro, arguably ratified and confirmed the Chief's adverse employment decision, reversed though it was by the Personnel Board. Perhaps the City was retaliating against the Personnel Board as well as against Morro. The Personnel Board is an entity which the City admits it doesn't care for.

In addition to published opinions, the City cites the unpublished opinion of Hon. Robert B. Propst of this court in *Bahakel v. City of Birmingham,* CV 90–PT–1834–S, affirmed by the Eleventh Circuit without opinion. Judge Propst's opinion, although not binding, might well be persuasive if it were not for

the fact that the Bahakel case was markedly different from the Morro case in several important respects. Those crucial distinctions need not be explored here.

### The City's Attack on the Jury Venire

When the venire appeared for the selection of seven civil jurors for the trial of this case, the venire consisted of eighteen white venirepersons. Defendants complained about the absence of black venirepersons, but the court proceeded with jury selection. Defendants adequately preserved their objection to the venire.

Even before the filing of the City's current Rule 50(b) motion, the court undertook its own investigation into the matter of the venire composition. The court consulted with the jury section of the Clerk's office and with other members of the court and arrived at the same explanation for the racial makeup of this particular venire as can be deduced from the City's motion. In solving one problem Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), created another. This venire was randomly drawn for this court's one case mid-month civil docket to start on March 18, 1996. The venire came from the "leftovers" from a much larger venire summoned for jury duty to commence at the beginning of the month on March 4, 1996, and designed to accommodate the jury needs in several criminal and civil trials before various judges.

It quickly becomes apparent that the juries actually empaneled in the Northern District of Alabama at the first of the month, by the exercise of so-called "preemptory" challenges, contain a higher percentage of black jurors than the original venire as a whole. This fact strongly suggests that Batson acts as a brake on the striking of black venirepersons, and has the indirect effect of leaving the remaining pool with a higher percentage of whites and a lower percentage of blacks than were in the original, total venire. In other words, by the middle of the month, the black jurors have been disproportionately "used up" as a proximate consequence of Batson. This court's research has not led it to a solution of this problem, if it is a problem, or to any case law which would render

unconstitutional or illegal this court's present system of jury selection. It would be enormously expensive, and perhaps unconstitutional, to randomly select from 31 north Alabama counties a separate venire for each and every specific jury case. The court can conceive of no other method that would come close to assuring an apportional racial representation in every venire.

■ Although Batson itself was not invoked in this case, except perhaps in an indirect way, Batson and its progeny are as much designed to protect potential jurors from disparate treatment as to guarantee litigants a racially or gender balanced jury. Therefore, if the local media correctly reports that the Mayor was not surprised by the verdict in this case against the City "from an all white jury," the Mayor is only exercising his freedom of expression, just as the jury found Morro to be doing. The Supreme Court in Batson would not agree with the Mayor as to what can be expected from an all-white jury, because it there said:

> Just as the Equal Protection Clause forbids the States to exclude black persons from the venire on the assumption that blacks as a group are unqualified to serve as jurors, so it forbids the States to strike black veniremen *on the assumption that they will be biased* in a particular case simply because the defendant is black. The core guarantee of equal protection, ensuring citizens that their State will not discriminate on account of race, would be meaningless were we to approve the exclusion of jurors *on the basis of such assumptions*, which arise solely from the jurors' race.

476 U.S. at 98, 106 S.Ct. at 1724 (emphasis supplied) (citation omitted). This expression can only mean that the Supreme Court believes, as this court does, that jurors of whatever race are presumed to be free of race prejudice, especially when they are instructed that prejudice can play no part in their deliberations.

It might also be worth noting that Chief Deutcsh, like Morro, is white, that Morro's fellow arresting officer, who was called as a witness by the City but whose testimony was

more favorable to Morro than to the City, is black, and that the police sergeant who investigated Morro, who testified against him and who now supervises him, is white. In fact, the testimony from the present Chief, who is black, was not particularly flattering to former Chief Deutcsh. This court could not detect any racial bias in a very attentive jury.

### The City's Last–Minute Proffer of a Newly Found Witness

■ The sergeant who investigated Morro, who testified against him before the Chief, before the Personnel Board and before the jury, and who now supervises him, during the trial suddenly found an alleged witness who the City said could contradict Morro's denial of an intent to join in a police conspiracy of silence against the City judge who had found Mr. Arrington "not guilty." Morro's case has been pending since 1992. Morro has testified on several occasions, including before the Personnel Board hearing officer. He has been consistent in denying any deliberate avoidance of duty. The final pre-trial order required the listing of witnesses. To have allowed an unlisted and still unnamed witness to testify for the City after Morro rested would have been unfair, prejudicial, and prolonging. The sustaining of Morro's objection to such a witness was well within the court's discretion granted by Rule 16(e), F.R.Civ.P., and Rule 403, F.R.E.

### Conclusion

All of the City's arguments worthy of response have, in this court's opinion, been responded to. There is no purpose to be served by saying what this court would have done at a bench trial of this case. This was a jury case tried by a jury peculiarly equipped to make credibility assessments on conflicting evidence, and the jury discharged its responsibility. For that reason, the City's post-judgment motion will be denied by separate order.

### ADDENDUM TO MEMORANDUM OPINION OF APRIL 12, 1996

Whether it is called "judicial estoppel," or by some other name, a good statement of the principle which, in this court's opinion, precluded the City's last minute reliance on a *Monell* argument, is found in *In the Matter of Linda Coal and Supply Co.,* 255 F.2d 653 (3d Cir.1958), in which the Third Circuit held:

> [T]he reason for holding a litigant to his announced theory becomes more compelling as the litigation proceeds to advanced stages. And the desirability of seeing an end to litigation would still call for application of the general rule for so confining a litigant if either the petition or the evidence are not permeated with the alternative theory which is now fully spelled out for the first time at this late date.

The First Circuit adopted the Third Circuit's reasoning as follows in *Wallace Motor Sales v. American Motors Sales Corp.,* 780 F.2d 1049, 1067 (1st Cir.1986):

> In *In Re Linda Coal and Supply Co.,* 255 F.2d 653 (3d Cir.1958), the Third Circuit addressed a similar situation where appellant claimed a theory on appeal which was not raised at trial but had been raised in the pleadings. In that case, the court refused to consider the alternative theory "which at best was raised only inferentially in the pleadings," *id.* at 656, and held that if neither the pleadings nor the evidence at trial were "permeated" with the alternative theory, it could not be raised on appeal. We adopt the reasoning of the Third Circuit.

The foregoing shall be considered an addendum to the memorandum opinion of April 12, 1996.