**Robert SUMNER, Plaintiff,**

v.

**MICHELIN NORTH AMERICA, INC., Defendant.**

**Civil Action No. 96–T–313–E.**

United States District Court, M.D. Alabama, Eastern Division.

June 13, 1997.

T. Dudley Perry, Jr., Perry & Perry, Montgomery, AL, for plaintiff.

Stephen E. Brown, Jeffrey A. Lee, Maynard, Cooper & Gale, P.C., Birmingham, AL, for defendant.

## MEMORANDUM OPINION

MYRON H. THOMPSON, Chief Judge.

In this lawsuit, plaintiff Robert Sumner claims that Uniroyal Goodrich Tire Company failed to accommodate his disability at its plant in Opelika, Alabama, in violation of the Americans with Disabilities Act of 1990, 42 U.S.C.A. §§ 12101 through 12117, 12201 through 12213, popularly known as the ADA. Sumner has sued defendant Michelin North America, Inc., Uniroyal's successor at the Opelika plant, and has invoked the jurisdiction of the court pursuant to 42 U.S.C.A. § 12117.

Shortly after jury trial of this matter commenced on February 3, 1997, Michelin made an oral motion for judgment as a matter of law pursuant to Rule 50(a)(1) of the Federal Rules of Civil Procedure. The company raised two grounds, either of which would be sufficient to defeat Sumner's claim under the ADA. First, Michelin asks that the court bar Sumner's claim under the doctrine of "judicial estoppel," which, in general terms, prevents a party who has maintained a position in one official proceeding from asserting a

contrary position in another. Second, Michelin argues that Sumner's claim is barred because he failed to file an administrative charge with the Equal Employment Opportunity Commission, commonly known as the EEOC, within the statutorily required 180-day time period.

After receiving all evidence on these two issues into the record and affording them due consideration, the court concludes that Sumner is not judicially estopped, but that his claim is time barred.

## I. STANDARD FOR JUDGMENT AS A MATTER OF LAW

Rule 50(a)(1) provides that, "If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable ruling on that issue." In other words, a trial judge must grant judgment as a matter of law "if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

## II. BACKGROUND

*November 1973:* Sumner was employed as a tire builder at the tire manufacturing plant owned and operated by Uniroyal in Opelika.

*September 1990:* Sumner suffered a serious on-the-job injury which, despite two surgical procedures and several months spent in a rehabilitation hospital, left him with physical and mental limitations.

*May 1991:* Sumner filed a complaint in state court seeking workers' compensation benefits from Uniroyal.

*October 1992:* Sumner returned to work and performed "makeshift" light-duty tasks at the plant.

*July 1993:* Sumner petitioned for and received state-court approval to settle his workers' compensation lawsuit. Despite the settlement, which, according to Michelin, "was greater than what he could have recovered for a 99% permanent loss of earning capacity disability,"[1] Sumner continued until December 1993 to perform "make-shift" light-duty tasks at the plant. In addition, throughout this period, he engaged in discussions with the plant industrial relations manager, Joe Danford, and other members of management regarding available positions at the plant and whether, given his limitations, he could perform the essential functions of these positions, or whether he would in fact be put on unpaid leave of absence.

*December 17, 1993:* Sumner and Danford again met to discuss various job openings at the plant in an effort to ascertain whether Sumner, with reasonable accommodation for his disabilities, could perform them. After they failed once more to identify any jobs Sumner could do, Danford informed him that he would be put on extended unpaid leave of absence for three years, effective December 27, 1997; alternatively, as permitted by the collective bargaining agreement governing Sumner's employment as a union member, Danford said that Sumner could elect to apply for disability retirement and its concomitant benefits.

*January 1994:* Sumner still desired to return to work at the plant and had one more unsuccessful meeting with Danford.

*February 1994:* Sumner applied for and was denied Social Security disability benefits.

*February 23, 1996:* Sumner filed a complaint in this court against Michelin, which had succeeded Uniroyal as owner and operator of the Opelika plant. He charged that Uniroyal had failed to accommodate him disabilities, in violation of the ADA. The parties do not dispute that Michelin is liable if Uniroyal violated the ADA.

## III. DISCUSSION

As stated, Michelin asserts that it is entitled to judgment as a matter of law on two grounds: First, the company contends that

---

1. Defendant's trial brief, filed on January 29, 1997, at 8.

Sumner is precluded from seeking relief by the doctrine of judicial estoppel. Second, the company contends that Sumner's claim is time barred.

### A. Judicial Estoppel

■ The doctrine of judicial estoppel is a vintage doctrine whose popularity varies from court to court nearly as greatly as its contours do. And yet. it is gaining renewed currency. The Ninth Circuit Court of Appeals is one of the courts to have infused it with renewed life and vigor. That court applied judicial estoppel most recently to an estate planning case in Hawaii. The court wrote: "Judicial estoppel, sometimes also known as the doctrine of preclusion of inconsistent positions, precludes a party from gaining an advantage by taking one position, and then seeking a second advantage by taking an incompatible position." *Helfand v. Gerson*, 105 F.3d 530, 534 (9th Cir.1997) (quoting *Rissetto v. Plumbers and Steamfitters Local 343*, 94 F.3d 597, 600 (9th Cir. 1996)). The doctrine is intended to prevent a litigant from "playing fast and loose with the courts." *Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir.1990), *cert. denied*, 501 U.S. 1260, 111 S.Ct. 2915, 115 L.Ed.2d 1078 (1991)

Michelin contends that the doctrine erects a bar to Sumner's ADA claim because Sumner previously took the position that he was permanently and totally disabled when he filed for state workers' compensation benefits and took the position that he was totally disabled when he filed for Social Security disability benefits.

### 1.

The first question is whether Sumner has, in fact, previously asserted that he is totally and permanently disabled. The record is replete with evidence that he has.

On May 17, 1991, Sumner filed a complaint in the Circuit Court of Lee County, Alabama, seeking workers' compensation benefits from his then-employer, Uniroyal. Therein, at ¶ 6, he states: "Plaintiff was totally disabled as a result and consequence of the injuries and damages he sustained as aforesaid, and he is permanently totally disabled." Some time after embarking on a program of rehabilitation and returning to work at the plant performing light duties, Sumner settled his workers' compensation claim against Uniroyal. The parties petitioned the state court on July 21, 1993, seeking its approval of the settlement agreement.[2] The petition, at ¶ 6, reads: "The plaintiff takes the position that he is totally and permanently disabled as a result of the accident described above." Uniroyal there took "the position that plaintiff is capable of engaging in gainful employment, and though plaintiff has sustained a partial disability the defendant insists that plaintiff is not totally disabled." *Id.* The parties then represented to the court that the extent of Sumner's injuries was "a bona fide dispute and controversy between the parties."[3] *Id.* at ¶ 7.

Furthermore, a notice from the Social Security Administration, dated May 11, 1994, informing Sumner of the agency's determination of the merits of his claim for disability benefits, says: "You state that you are, disabled and unable to work." The agency ruled, however, that Sumner was not entitled to disability benefits, and was not disabled, because he was "capable of performing work which does not require heavy lifting" and his "condition [was] not severe enough to keep [him] from working."

Finally, Sumner's deposition in the instant case includes a fascinating colloquy, wherein Sumner manages to both admit and deny that he was totally and permanently disabled when his workers' compensation claim, and later the settlement petition, was filed with

---

2. The settling parties petitioned the court for approval pursuant to 1975 Ala.Code § 25–5–56. The statute requires court approval of a settlement for less than the amount of benefits a worker would otherwise be entitled to under the worker's compensation schedule. The judge must determine, in that case, that the settlement is in the best interest of the employee.

3. The fact that the parties disputed the extent of Sumner's injuries in the petition is something of a canard, since it was filed in July 1993, and Sumner had already returned to work performing light-duty tasks in October of 1992, and in his view, would be returned to his old job, or another permanent job, upon settlement.

the court, and to equivocate about whether he knew that he was signing his name to documents submitted to the court that contained materially false statements, attributable to him, concerning his physical condition and ability to work:

"Q: Now you swore, did you not, that the information contained in this complaint was true and correct, is that right?

A: To the best of my knowledge.

\* \* \* \* \* \*

Q: Did you know that you were swearing that the matters contained in this document were true and correct?

A: To the best of my knowledge, yes.

Q: And you knew that this document was going to be filed into the Circuit Court of Lee County, didn't you?

A: Right.

Q: Paragraph six of your complaint ... says 'Plaintiff was totally disabled ... and he is permanently and totally disabled.' Is that statement true or false?

A: Well, this statement, I told them in the deposition that I was able to work.

\* \* \* \* \* \*

Even the lawyer, I told him there was jobs I could do out there.

Q: So are you saying that the statement contained in paragraph six is false?

A: Yes.

Q: But you signed that document swearing its true and correct, at that time, didn't you?

A: Yes.

Q: Why did you not tell the truth?

\* \* \* \* \* \*

A: Well, at that time, I was not able to work, in '91.

Q: Were you totally and permanently disabled in 1991?

A: At this point in time is before—at the time I signed this is when I was wandering, doing things that I didn't know what I was doing. At that point in time, yes, I was. But once I went to

the rehab, it was a totally different story.

Q: Okay. After the rehab, you weren't permanently and totally disabled, is that correct?

A: Right.

Q: And you wouldn't make that statement to a court, would you?

A: Not that I know of.

Q: Because if you made it, that would be untrue, wouldn't it?

A: Right.

\* \* \* \* \* \*

(Sumner is shown the settlement petition, signed well after he completed his rehab.)

Q: And again, you knew that the matters that you were saying in here were sworn matters, is that correct?

A: Yes.

Q: You swore to tell the truth, didn't you?

A: Yes.

\* \* \* \* \* \*

Q: You signed this document on July 21, 1993, isn't that correct?

A: Right.

Q: In paragraph six, it says, 'The plaintiff takes the position that he is totally and permanently disabled.' That wasn't true, was it? Or was it true?

A: See, I didn't read all this. This was explained to me, and that was it.

\* \* \* \* \* \*

I didn't read it, no. It was explained to me what was in it.

\* \* \* \* \* \*

My wife was reading them.

\* \* \* \* \* \*

Q: Did you or did you not know that in this document, you were taking the position that you were totally and permanently disabled?

A: No.

Q: Did you know that the amount of worker's compensation benefits that

you received would be directly related to the extent of your disability?

A: Yes."

On the witness stand, in the jury's absence, at trial on February 3, 1997, as the court received evidence to complete the record on the issue of judicial estoppel, Sumner's wife testified to the effect that the Sumners, upon the advice of their attorney, took an aggressive bargaining posture in the workers' compensation case by claiming total disability in order to maximize the amount they might receive in a judgment or through a settlement.[4]

The record leaves no doubt that Sumner has previously sworn to being totally and permanently disabled. Before the court can decide whether these assertions should preclude, or at least weigh heavily against, Sumner's ADA claim, it will have to address two antecedent questions: Under what conditions, that is to say, for what purposes, should a court apply the equitable doctrine of judicial estoppel to prevent a party from proceeding with a lawsuit before it? And do the circumstances in this case satisfy those conditions, or advance those purposes, sufficiently to outweigh the policies driving the ADA?

2.

▪ Michelin suggests that, under the judicial estoppel doctrine, a plaintiff who has previously sought workers' compensation or Social Security benefits based on a representation that he is totally and permanently disabled is *per se* barred from seeking relief under the ADA. The court rejects this argument, for, as will be demonstrated below, the positions a party might take in applying for workers' compensation and Social Security benefits are not necessarily inconsistent with the position he might take in pursuing an ADA claim.

The ADA is a sweeping civil rights law designed "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C.A. § 12101(b)(1). It is designed "to provide clear, strong, consistent, and enforceable standards addressing discrimination against individuals with disabilities." § 12101(b)(2). The ADA prohibits employers from discriminating against "qualified individuals with disabilities" in all aspects of employment. § 12111(8). To be protected by the Act, a person must meet the definition of the term "qualified individual with a disability." A "qualified individual with a disability" is "an individual with a disability who satisfies the requisite skill, experience, education, and other job-related requirements of the employment position such individual holds or desires, and who, *with or without reasonable accommodation,* can perform the *essential functions* of such position." 29 C.F.R. § 1630.2(m) (emphasis added). By including the phrase 'qualified individual with a disability,' "Congress intended to reaffirm that the ADA 'does not undermine an employer's ability to choose and maintain qualified workers.'" EEOC Enforcement Guidance on the Effect of Representations Made in Applications for Benefits on the Determination of Whether a Person Is a "Qualified Individual with a Disability" Under the Americans with Disabilities Act of 1990(ADA), EEOC Notice No. 915.002, at E–13 n. 2, released February 12, 1997, *reprinted in* BNA's Daily Labor Report, No. 1418–2693/97 (Feb. 14, 1997) (hereinafter EEOC Enforcement Guidance) (quoting S.Rep. No. 101–116 at 26 (1989)).

4. She testified as follows:
"Q: You read the part [of the settlement documents] that says that Mr. Sumner is claiming that he's permanently and totally disabled, correct?
A: Yes, that's correct.
Q: And you didn't have that changed?
A: Didn't have it changed. Our attorney told us that was just a thing that attorneys did for their position.
Q: Mr. Sumner also testified in his deposition that he understood that the more disability he claimed, the more settlement he would recover in his Worker's Compensation claim. That's correct, isn't it?
A: Well, correct but not correct. I mean, in all actuality, it was a legal maneuvering that we didn't quite understand. His attorney said, 'This is just what we do, and then the other side claims this and then you come somewhere in the middle. And that's how it all works out.' That's how they explained it."

The ADA, therefore, requires employers to provide a "reasonable accommodation" to "known physical or mental limitations" of otherwise qualified individuals with disabilities unless doing so would result in "undue hardship." 42 U.S.C.A. §§ 12111(10), 12112(b)(5)(A); 29 C.F.R. §§ 1630.2(p), 1630.9(a). This reasonable accommodation requirement, which is critical to achieving the goals of the Act, includes "modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position." 29 C.F.R. § 1630.2(o)(1)(ii). Some of the most common accommodations an employer may be required to provide are reassignment to vacant positions, job restructuring, part-time or modified work schedules, modification of equipment or devices, and other similar accommodations. § 1630.2(o)(2).

To be sure, within the definitional structure of the ADA statute and regulations, someone who is totally and permanently disabled cannot be a 'qualified individual with a disability.' But the question is far less straightforward whether being totally and permanently disabled, as defined in other statutory or regulatory contexts, such as under workers' compensation or Social Security laws, is intrinsically incompatible with any level of disability that would still permit an employee to perform the essential functions of any job, with accommodations.

Unlike the ADA definition, the definition of disability under the Social Security Act does not consider whether the individual can work with reasonable accommodation. Titles II and XVI of the Act provide benefits to persons determined to be "disabled" and entitled to benefits under the Social Security Disability Insurance (SSDI) and Supplemental Security Income (SSI) programs. 42 U.S.C.A. §§ 401–433, 1381–1385. Under both Titles, disability is defined as "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve (12) months." 42 U.S.C.A. §§ 423(d)(1)(A), 1382c(a)(3)(A). According to the Supreme Court, "the Secretary has promulgated regulations creating a five-step test to determine whether an adult claimant is disabled.... The first two steps involve threshold determinations that the claimant is not presently working and has art impairment which is of the required duration and which significantly limits his ability to work.... In the third step, the medical evidence of the claimant's impairment is compared to a list of impairments presumed severe enough to preclude any gainful work.... If the claimant's impairment matches or is 'equal' to one of the listed impairments, he qualifies for benefits without further inquiry.... If the claimant cannot qualify under the listings, the analysis proceeds to the fourth and fifth steps. At these steps, the inquiry is whether the claimant can do his own past work or any other work that exists in the national economy, in view of his age, education, and work experience. If the claimant cannot do his past work or other work, he qualifies for benefits." *Sullivan v. Zebley*, 493 U.S. 521, 525–526, 110 S.Ct. 885, 888–889, 107 L.Ed.2d 967 (1990) (citations and footnote omitted).

In light of this definitional and assessment structure, an "interpretative guidance" issued by the Social Security Administration addressing the effect of the ADA on the Social Security disability determination process states as follows: "The fact that an individual may be able to return to a past relevant job, provided that the employer makes the accommodations, is not relevant to the issue(s) to be resolved.... [H]ypothetical inquiries about whether an employer would or could make accommodations that would allow return to a prior job would not be appropriate." EEOC Enforcement Guidance at E–5 (quoting "Americans with Disabilities Act of 1990–INFORMATION," Memorandum from the Associate Commissioner, Social Security Administration 1 (June 2, 1993). Thus, the Social Security Administration may find that a person is unable to do any work that exists in the national economy even though that person can work with a reasonable accommodation. In those instances the person is both a per-

son with a total disability under the Social Security Act and a yet "qualified individual with a disability" under the ADA. Accordingly, a person claiming to be totally disabled or found to be totally disabled under the Social Security Act still may be entitled to protection under the ADA.

Similarly, unlike the ADA definition for "qualified individual with a disability,' state workers" compensation law definitions of "disability"—and Alabama's in particular—do not consider whether an individual can work with a reasonable accommodation. *See, e.g.,* 1975 Ala.Code §§ 25–5–1 to 25–5–318. In many workers' compensation cases, a person has a "disability" when he is unable to do certain tasks—that is, has lost some or all earning capacity; there is no requirement of, or allowance for, reasonable accommodation by the employer. *See, e.g.,* § 25–5–57(a)(4)d ("[A]ny physical injury or mental impairment resulting from an accident which ... permanently and totally incapacitates the employee from working at and being retrained for gainful employment, shall constitute ... the sole basis on which an award of permanent total disability may be based."); § 25–5–57(a)(2)a ("For temporary partial disability, the compensation shall be 66⅔ percent of the difference between the average weekly earnings of the worker at the time of the injury and the average weekly earnings he or she is able to earn in his or her partially disabled condition."). Thus a person may be totally and permanently disabled for workers' compensation purposes and yet still be able to perform a position's essential functions with or without reasonable accommodation.[5]

Courts have recognized this important difference between the ADA definition of "qualified individual with a disability" and other definitions of "disability." For example, in *D'Aprile v. Fleet Services Corp.,* 92 F.3d 1 (1st Cir.1996), the First Circuit Court of Appeals reversed a district court's grant of summary judgment on a claim for reasonable accommodation under a state handicap law where the plaintiff had sought insurance disability benefits. The court found that plaintiff's contention that she was unable to work because her employer had refused her request for a modified schedule was "entirely consistent with her claim of totally disabled" within the meaning of the insurance policy. *Id.* at 5. The court noted that plaintiff asserted that she could work on a part-time basis and that she in fact had worked part time. The court therefore found that there existed a genuine issue of material fact as to whether the plaintiff could have worked with a reasonable accommodation. *See also Mohamed v. Marriott Intern., Inc.,* 944 F.Supp. 277, 281–82 (S.D.N.Y.1996) ("[I]t would be inappropriate to invoke the fact-sensitive and limited doctrine of judicial estoppel to erect a per se bar to ADA protection for individuals who have also applied for and/or received SSDI benefits. Such uncritical application of judicial estoppel fails to recognize significant differences in ... the applicable legal standards of the ADA and the Social Security Act."); *Pegues v. Emerson Elec. Co.,* 913

---

**5.** The ADA definition of 'qualified individual with a disability' differs from other statutory definitions of 'disability' in other regards as well. First, the Social Security Act and many state workers compensation laws permit general presumptions about an individual's ability to work. For example, as already indicated, the Social Security Act considers some conditions to be presumptively disabling, and some workers' compensation statutes presume that some conditions are so severe as to reduce earning capacity. *See* 1975 Ala.Code § 25–5–57(a)(3). In such instances, a claimant does not have to make any representations about ability to work. In contrast, the ADA requires an individualized inquiry into the ability of a particular person to meet the requirements of a particular position. Indeed, the ADA presumes that a person is able to work. Second, in determining whether a person meets the definition of 'disability,' the Social Security

Act and many state workers' compensation acts looked at the customary requirements of jobs as usually performed in the national economy without focusing on the essential functions of a particular position. All tasks required to perform the job are considered with no distinction made between essential and peripheral functions. Thus a person who is able to perform the essential functions of a particular position but not the marginal functions, may be found to be unable to work and eligible for benefits. In contrast, the ADA, again, requires an individual inquiry into the ability of the person to perform the essential functions of the task. Therefore, in all these instances, an individual can have a total disability under the Social Security Act or a state workers' compensation act and yet in fact be still able to work under the definition of 'qualified individual with a disability' under the ADA.

F.Supp. 976, 980 (N.D.Miss.1996) ("[T]he court does not believe that a finding of disability by the Workers' Compensation Commission or the Social Security Administration necessarily forecloses an ADA claim."); *Smith v. Dovenmuehle Mortgage, Inc.*, 859 F.Supp. 1138, 1141–43 (N.D.Ill.1994) (plaintiff's prior: representation of disability to SSA did not judicially estop him from raising subsequent ADA claim); *Labonte v. Hutchins & Wheeler*, 424 Mass. 813, 678 N.E.2d 853, 856 (1997) ("A majority of courts have rejected a defendant's claim that seeking benefits automatically disqualifies a plaintiff from pursuing a handicap discrimination claim."); EEOC Enforcement Guidance; Anne Beaumont, *This Estoppel Has Got to Stop: Judicial Estoppel and the Americans with Disabilities Act*, 71 N.Y.U.L.Rev. 1529 (1996).[6]

Here, the simple fact that Sumner claimed he was disabled under the Social Security Act and permanently and totally disabled under Alabama's Workers' Compensation Act is not necessarily inconsistent with his claim for relief under the ADA. Indeed and ironically, the circumstances surrounding Sumner's receipt of workers' compensation benefits demonstrate this conclusion dramatically. By Michelin's own admission, Uniroyal settled Sumner's workers' compensation claim for more than he would have received for 99% permanent loss, and yet both Uniroyal and Sumner informed the state judge at the time of settlement that Sumner would continue the next day with the light-duty work he had been given because of his injury. Thus, it appears that Uniroyal, Sumner, and even the state judge all recognized that Sumner was disabled for workers' compensation purposes and yet still able to return to work at Uniroyal with some accommodation.

The EEOC appears to suggest, based in large measure on public policy considerations, that the judicial estoppel doctrine is not only not a *per se* bar to an ADA claim, it has *no application at all* in the fact-intensive inquiry into whether a person is entitled to relief under the Act. EEOC Enforcement Guidance at E–9. The Commission adds, however, that representations made in other context, while not dispositive, are relevant evidence, which should be considered along with all other evidence in assessing an ADA claim. The EEOC enjoins its investigators to consider the following factors "When deciding what, if any, weight to give to [a claimant's] representations made while pursuing disability benefits," *id.* at E–13: (1) the definition of disability, or total disability, under the relevant statute or contract; (2) the specific content of the representations (in particular, whether they were qualified), who made them, and the purpose for which they were made; (3) whether the representations are in the claimant's own words; (4) the period of time to which the representations refer, when they were made, and whether the claimant's mental or physical condition might legitimately have changed since; (5) whether the claimant was in fact working during the period of time referenced as a period of total disability; (6) whether the employer suggested that the claimant apply for benefits; (7) whether claimant asked for and was denied a reasonable accommodation; (8) when the employer learned of the representations; and (9) other relevant factors, such as advances in technology or changes in the employer's operations that may have occurred since the representations were made that make it possible for the claimant to perform essential functions of a position with or without reasonable accommodation. *Id.*

---

**6.** Admittedly, in *McNemar v. The Disney Store, Inc.*, 91 F.3d 610 (3d Cir.1996), *cert. denied,* — U.S. —, 117 S.Ct. 958, 136 L.Ed.2d 845 (1997), the Third Circuit Court of Appeals did not entertain warmly the argument that the fact that ADA's standards and purposes are fundamentally different from those of the Social Security Act precludes application of judicial estoppel. In that case, the plaintiff, who had AIDS, applied for and received Social Security and state disability benefits after he was fired from his position of assistant manager. He certified on his benefits applications that he had become unable to work approximately five weeks before his discharge. In affirming the district court's grant of summary judgment for the defendant, the appellate court found that it was irrelevant that AIDS is a presumptively disabling condition and thus automatically renders a person "unable to work" for purposes of Social Security benefits, since the person claimed that he was physically unable to work. This court declines to follow *McNemar's* approach.

The court need not reach the question of whether the doctrine has *no application at all* under the ADA, for, assuming that the doctrine applies to ADA claims, the doctrine does not apply to Sumner's.

3.

■ As the Eleventh Circuit Court of Appeals has explained, "Judicial estoppel is a doctrine whereby a party is estopped from asserting a proposition in the present proceeding 'merely by the fact of having alleged or admitted in his pleadings in a former proceeding under oath' an allegation to the contrary," *Bregman v. Alderman*, 955 F.2d 660, 664 n. 3 (11th Cir.1992) (citing a case from Texas, *Long v. Knox*, 155 Tex. 581, 291 S.W.2d 292 (1956)). " 'Judicial estoppel is applied to the calculated assertion of divergent sworn positions. The doctrine is designed to prevent parties from making a mockery of justice by inconsistent pleadings.' " *McKinnon v. Blue Cross and Blue Shield of Ala.*, 935 F.2d 1187, 1192 (11th Cir.1991) (quoting *American Nat'l Bank v. Federal Dep. Ins. Corp.*, 710 F.2d 1528, 1536 (11th Cir.1983)) (internal citation omitted). *See also Original Appalachian Artworks, Inc. v. S. Diamond Assocs., Inc.*, 44 F.3d 925, 929–30 (11th Cir.1995) (applying state law in diversity action to find Georgia law would not support application of judicial estoppel on facts of case), *cert. denied*, —— U.S. ——, 116 S.Ct. 705, 133 L.Ed.2d 661 (1996); *Chrysler Credit Corp. v. Rebhan*, 842 F.2d 1257, 1261 (11th Cir.1988) (doctrine to be applied flexibly in cases arising under federal law in order to serve underlying federal common law policy of preventing deliberate manipulation of courts through calculated assertion

of divergent sworn positions in judicial proceedings).

These are the broad strokes of the doctrine. It is the fine lines courts draw around and between them that leave the doctrine with a rather uncertain outline.[7] And where these fine lines are to be appropriately drawn has direct bearing on this case.

When emphasis is put on the "litigant's relationship to the court," *Donaldson v. Bernstein*, 104 F.3d 547, 555–556 (3rd Cir. 1997), whether or not a prior representation to the court ultimately was accepted by the court recedes in importance, as does identity between the opposing party in the prior litigation and the party seeking to estop a claim in the later litigation, since detrimental reliance is not of primary concern. *See, e.g., Bregman*, 955 F.2d at 664 n. 3. However, when the factfinding function of the court is highlighted, judicial estoppel is often applied more "judiciously" to cases in which a previous court made a finding or decision that was favorable to a litigant or actually yielded an advantage, particularly where the opponent was identical in both cases, or each was in privity with the other.[8] *Compare Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 419 (3d Cir.), *cert. denied*, 488 U.S. 967, 109 S.Ct. 495, 102 L.Ed.2d 532 (1988) *and Donaldson*, 104 F.3d at 556 (doctrine designed to prevent parties from playing fast and loose with the courts by making inconsistent representations whenever it suits them) *with U.S. for Use of American Bank v. C.I.T. Const. Inc. of Texas*, 944 F.2d 253, 259 (5th Cir.1991) (judicial estoppel designed to protect judicial integrity by preventing parties from contradicting a prior court determination, not themselves) *and Teledyne Indus., Inc. v. NLRB*, 911 F.2d

---

7. *See* 18 James Wm. Moore, et al., Moore's Federal Practice 3d § 134.30 at 134–62 n. 5 (citing *Lowery v. Stovall*, 92 F.3d 219, 223 (4th Cir. 1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 954, 136 L.Ed.2d 841 (1997)). *See also Patriot Cinemas, Inc. v. General Cinema Corp.*, 834 F.2d 208, 212 (1st Cir.1987) ("The specific requirements [of judicial estoppel], however, are rather vague and vary from state to state and from circuit to circuit."); *Allen v. Zurich Ins. Co.*, 667 F.2d 1162, 1166 (4th Cir.1982) ("The circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation or principle."). In fact, the

Tenth Circuit Court of Appeals does not accept the doctrine at all. *See, e.g., United States v. 49.01 Acres of Land*, 802 F.2d 387, 390 (10th Cir.1986).

8. Admittedly Uniroyal was Sumner's adversary in the worker's compensation litigation, and Michelin the adversary in this litigation. However, because the parties have agreed that Michelin has simply stepped into Uniroyal's shoes, divergence of opinion on the importance of that factor does not warrant further consideration.

1214, 1217–18, 1217 n. 3 (6th Cir.1990) (same) *and Lowery,* 92 F.3d at 223, 224 (same). These two underlying theories, of judicial estoppel have been glossed as the "sanctity of the oath" approach and the "prior success" rule. *Reynolds v. Commissioner of Internal Revenue,* 861 F.2d 469, 475 (6th Cir.1988) (Kennedy, J., dissenting).

■ While, under the "prior success" rule, judicial acceptance of a stated position does not occur only where a party ultimately prevails on the merits, it does mean, at least, that 'the first court has adopted the position urged by the party, either as a preliminary matter or as part of a final disposition.' *Teledyne,* 911 F.2d at 1218 (quoting *Edwards v. Aetna Life Ins. Co.,* 690 F.2d 595, 599 n. 5 (6th Cir.1982)). Certainly, for judicial estoppel to apply as a result of a negotiated settlement approved by the court, or an agreed order entered by the court, there must at least have been a finding by the court, a stipulation, or an assertion or admission by the party against whom estoppel will later be sought. But most commonly, in civil actions, when parties petition the court to approve a settlement or enter an agreed order, there is no implication that the court has *accepted* whatever terms it contains. Therefore, in that situation, since the court has not accepted or endorsed anyone's position, there can be no recourse to judicial estoppel in a letter proceeding. *Reynolds,* 861 F.2d at 473; *Edwards,* 690 F.2d at 600.

On this version, Sumner could not be estopped because the petition for settlement of his workers' compensation case was approved by the court without a ruling on or acceptance of Sumner's position that he was totally disabled, since the parties merely stipulated that they subscribed to different positions on this issue.[9]

■ There is little precedent in this area from the Eleventh Circuit Court of Appeals, and virtually none on the matter of judicial acceptance of the prior representation.[10]

However, of the few Eleventh Circuit cases discussing or applying judicial estoppel, none has resulted in estoppel of a party who did not engage in a calculated reversal of positions. *See, e.g., Chrysler Credit Corp.,* 842 F.2d 1257 (11th Cir.1988). Thus, it is at least clear that this circuit adheres to a requisite of intent. Also, judicial estoppel ought to be applied with caution "because of the harsh results attendant with precluding a party from asserting a position that would normally be available to the party." *Lowery,* 92 F.3d at 224.

■ Without further guidance from precedent in this circuit, and with fealty to the instruction to apply the doctrine of judicial estoppel flexibly to protect the court's integrity against those ready to play fast and loose within its sanctum, the court reaches its own conclusion, as an initial matter, that the prior success rule is not entirely coherent, risks collapsing judicial estoppel into equitable estoppel, and partially defeats its own avowed purpose of protecting the integrity of the courts. If judicial estoppel should be "applied with caution to avoid impinging on the truthseeking function of the court because the doctrine precludes a contradictory position without examining the truth of either statement," *Teledyne,* 911 F.2d at 1218, then it should be applied regardless of whether a position succeeded or not, since truth and success are not always commensurate. This is particularly true in the area of on-the-job injury, where the long-term medical prognosis may be anything but apparent at the time an injured worker must expediently decide what forms of benefits and compensation to seek in order to pay medical bills and meet living expenses. The court only damages its own integrity when it refuses to reconsider whether it (or another court or agency, or the party) was, in fact, mistaken or misled the first time around. The "prior success rule" amounts to a "saving judicial face" version of the doctrine,

---

9. In fact, the petition was filed in July 1993, and Sumner had already returned to work performing light-duty tasks in October of 1992.

10. The epigrammatic directive from *Bregman*— "a party is estopped ... *merely* by the fact of

having alleged or admitted ... in a former proceeding," 955 F.2d at 664 n. 2, was not applied even in that case, and thus cannot be considered Circuit precedent.

which is hardly tantamount to preserving the court's integrity.

 For instance, the *Teledyne* court observed that the doctrine, to be consistent, should not, in the name of averting damage to the integrity of courts, allow exceptions in cases where the prior position was the result of inadvertence or mistake, because "a party inherently argues that a prior position was false if the new position contradicts it," and so the exceptions would swallow up the rule. 911 F.2d at 1218 n. 4. The court did not see the irony in its own position, because in allowing exceptions to correct previous blunders, whoever's they may be, the integrity of the judicial system is preserved. In that regard, prior success is immaterial. The court should not use an equitable doctrine to estop itself from exercising its judgment, but rather to estop parties from taking bad faith positions before it. Clearly then, neither the court's desire to leave a position undisturbed once it or another court has accepted it, nor the reliance upon that position, to its detri-

ment, of another party, as required for equitable estoppel, is crucial.[11] What the doctrine does demand of the court is careful attention to the totality of the facts of each case before it, to see not only whether a party is advocating a position that is inconsistent with a position it has previously taken under oath,[12] but also to see whether, in doing so, that party is engaging in "cold manipulation and not an unthinking or confused blunder." *Johnson Serv. Co. v. Transamerica Ins. Co.*, 485 F.2d 164, 175 (5th Cir.1973).[13] The court thus finds persuasive the formulation found in *McNemar v. The Disney Store, Inc.*, 91 F.3d 610 (3d Cir.1996), where the court explicitly rejected a requirement of judicial acceptance of the prior position in favor of a case by case analysis of whether a party is seeking to take improper advantage of the court by arguing mutually exclusive propositions in different fora. *Id.* at 617–618.[14] This approach is also consistent with that taken recently by the Ninth Circuit in *Helfand*[15] and *Rissetto*, and the

11. "Unlike equitable estoppel, a party asserting judicial estoppel does not have to prove detrimental reliance because judicial estoppel is designed to protect the integrity of the courts rather than any interests of the litigants." *Lowery*, 92 F.3d at 223.

12. Courts that require judicial acceptance often also insist that the position to be estopped be one of fact, rather than law or legal theory, *see, e.g., Lowery*, 92 F.3d at 224. "The greater weight of federal authority, however, supports the position that judicial estoppel applies to a party's stated position, regardless of whether it is an expression of intention, a statement of fact, or a legal assertion." *Helfand*, 105 F.3d at 535 (citing cases from four other circuits). Sumner's assertion of total and permanent disability, while at least a statement of fact, also has a legal component, since it was made in the context of meeting the definitions codified in certain statutes and regulations in order to qualify for their benefits. Therefore this disagreement does not touch directly on this case.

Courts are also split on whether an assertion under oath of total disability in an administrative application for disability benefits is sufficient for judicial estoppel to later apply in a court proceeding on an ADA claim, or whether the prior proceeding must have been a true judicial one. In this circuit, the law is scarce, but appears to still embrace the latter view. *See Chrysler Credit*, 842 F.2d at 1261; *Dockery v. North Shore Med. Ctr.*, 909 F.Supp. 1550, 1556–'59 (S.D.Fla.1995) (rejecting per se rule regarding administrative

disability applications). However, the overall trend is clearly towards the former view. *See, e.g., Norris v. Allied–Sysco Food Svcs., Inc.*, 948 F.Supp. 1418, 1444 (N.D.Cal.1996) (Vacating earlier opinion that followed *Dockery*). Both *Norris* and *Dockery* provide thorough summaries of developments in this area of the law. Since the prior workers' compensation proceeding in this case was a judicial one, however, this question also does not pertain and need not be reached by the court here.

13. In *Bonner v. Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

14. The court believes, however, for the reasons explained above about benefit applications, that however appropriate the outcome may be on the specific facts of the *McNemar* case, a plaintiff should not be estopped on principle from bringing an ADA claim solely because he has previously represented, under oath, in applications for Social Security and disability benefits, that he is totally and permanently disabled. *See supra* note 6.

15. The *Helfand* court said "It is the position stated, not the motivation behind the position, that guides our analysis," and parties "are bound by their attorney's assertions." 105 F.3d at 535. This broad *per se* rule was mitigated, however, to

Fifth Circuit Court of Appeals in *In re Criswell*, 102 F.3d 1411, 1419 .& n. 36 (5th Cir. 1997) (citing *Brandon v. Interfirst Corp.*, 858 F.2d 266, 268 (5th Cir.1988)), and resembles, in important respects, the approach of this court's sister court in *Morro v. City of Birmingham*, 926 F.Supp. 1033 (N.D.Ala.1996).[16]

### 4.

■ Therefore, the court believes it best to address a defense of judicial estoppel to ADA claims in the following way: first, the court should conduct a detailed inquiry into whether the plaintiff really did make inconsistent claims in separate judicial or administrative proceedings, by looking closely at the pertinent legal, statutory, or regulatory frameworks, along with the totality of factual circumstances, surrounding the claims in each proceeding; next, the court should make a fact-sensitive determination of the true circumstances surrounding the plaintiff's averments of disability and employability, to decide whether the plaintiff intended to mislead, or otherwise proceeded in bad faith. No two cases will be exactly alike, and the court will retain the flexibility to set the bar of judicial estoppel at the height appropriate to each plaintiff.

■ Toward this and, the following factors (borrowed from the discussion above) seem appropriate and should be considered: (1) the definition of disability, or total disability, under the relevant statute or contract; (2) the specific content of the representations (in particular, whether they were qualified), who made them, and the purpose for which they were made; (3) whether the representations are in the claimant's own words; (4) the period of time to which the representations refer, when they were made, and whether the claimant's mental or physical condition might legitimately have changed since; (5) whether the claimant was in fact working during the period of time referenced as a period of total disability; (6) whether the employer suggested that the claimant apply for benefits; (7) whether claimant asked for and was denied a reasonable accommodation; (8) when the employer learned of the representations; and (9) other relevant factors, such as advances in technology or changes in the employer's operations that may have occurred since the representations were made that make it possible for the claimant to perform essential functions of a position with or without reasonable accommodation.

■ With the above factors in mind, the court turns to the question of whether the conditions for just application of judicial estoppel are satisfied in this case.

#### i.

First, the circumstances surrounding Sumner's original complaint for workers' compensation benefits must be looked at more carefully. As suggested earlier, in the area of on-the-job injury, where the long-term medical prognosis may be anything but apparent at the time an injured worker must expediently decide what forms of benefits and compensation to seek in order to pay bills and

make allowance for cases where "a party's prior position was based on inadvertence or mistake," because judicial estoppel "seeks to prevent the *deliberate* manipulation of the courts." *Id.* at 536·(emphasis added). Thus, the Ninth Circuit's approach is compatible with the view of courts of both schools that "the party sought to be estopped must have intentionally misled the court to gain unfair advantage." *Stovall*, 92 F.3d at 224 (citing *Tenneco Chems., Inc. v. William T. Burnett & Co., Inc.*, 691 F.2d 658, 665 (4th Cir. 1982). *See also Ryan Operations G.P. v. Santiam–Midwest Lumber Co.*, 81 F.3d 355, 361 (3d Cir.1996) (party to be estopped must have raised one or both of two inconsistent claims in bad faith)).

16. *Morro* cites an old Fifth Circuit Court of Appeals case with approval, as follows:

"A party, who in litigation with his adversary has, with knowledge of the facts, asserted a particular claim, title, or right, cannot afterward assume a position inconsistent with such claim, to the prejudice of the same adversary, who has acted in reliance upon such claim being as it was previously made; in other words, a party who, for the purposes of maintaining his position in litigation, has *deliberately represented a thing in one respect*, is estopped to contradict his own representation by giving the same thing another aspect in litigation with the same adversary as to the same subject matter."

*Id.* at 1040–41 (citing *Texas Co. v. Gulf Refining Co.*, 26 F.2d 394, 397 (5th Cir.), *cert. denied*, 278 U.S. 625, 49 S.Ct. 27, 73 L.Ed. 545 (1928)). While this view also conflates judicial and equitable estoppel, it captures well the essential elements of inconsistency and calculation.

meet expenses, a claim of total disability must be regarded as provisional, in keeping with the liberal pleading requirements of Rule 8 of the Federal Rules of Civil Procedure.[17] There is no reason why an injured employee should be held to a stricter standard in an original application or complaint for statutory benefits than a civil litigant is in other kinds of lawsuits. If the latter may amend a complaint, once as a matter of course, and subsequently upon leave of the court,[18] as facts develop and understanding dawns, then an injured employee should enjoy the same privilege and right. In fact, the Alabama Worker's Compensation Act itself allows for that possibility. Section 25–5–57(a)(4)b of the 1975 Alabama Code says: "At any time, the employer may petition the court ... to alter, amend, or revise the award or approval of the compensation on the ground that as a result of physical or vocational rehabilitation, or otherwise, the disability from which the employee suffers is no longer a permanent total disability." If the Alabama law of workers' compensation will allow that what was once permanent may no longer be, then so should this court. That is why this court sees no justice in a blanket rule barring applicants for total disability benefits from subsequently bringing ADA lawsuits.

Sumner filed his complaint seeking workers' compensation benefits from his employer long before he underwent rehabilitation, let alone returned to work. From this filing alone, therefore, the court can also infer little in the way of intent to undermine the integrity of the court. Sumner continued to undergo regular medical and vocational evaluation throughout 1993; thus no conclusions were reached about his capacity to return to full employment status until December 1993, when he was put on extended leave. A June 1993 report from a vocational consultant hired by Sumner's attorney in the worker's compensation case opined that Sumner would be unable to find employ outside of Uniroyal, that his "light-duty" tasks at Uniroyal were not real work at all, and that his vocational disability rating was 100%.[19] And yet, in deposition testimony taken in that same lawsuit, also recorded in June of 1993, Sumner responded to the question whether he felt like he would be able to do more things if Uniroyal had the work to give him, "Sometimes, yes."[20] Sumner also testified in this case that it was always his hope and desire to return to full employment at Uniroyal, and that he has said so consistently throughout.[21] No evidence to contradict that statement has emerged. The picture presented by the evidence in this case, viewed as a whole, is hardly that of a person trying to play fast and loose with the courts.

#### ii.

The court must next address in more detail the events that framed the settlement of Sumner's workers' compensation lawsuit. There is uncontroverted evidence in the record that, at a settlement conference before the state court judge in the workers' compensation case, the judge asked Sumner whether he was satisfied with the settlement, to which Sumner responded that he was, because he was going back to work. The state court judge also asked Uniroyal whether Sumner would return to work, and was told that he would. Although Sumner did return to his light-duty tasks the very next day, he had understood, based on representations from Richard Lynn, the Safety Director at Uniroyal, that after settlement he would be placed in a permanent job.[22]

---

17. Rule 8(e) explicitly provides for alternative pleading "regardless of consistency."

18. Rule 15 of the Federal Rules of Civil Procedure.

19. Defendant's trial exhibit 25.

20. Plaintiff's trial exhibit 5.

21. For example, Sumner testified:

"q: And in that settlement you took the deposition [sic] that you were totally disabled.

a: No, I never did say I was totally disabled.

q: The papers said—

a: Well the papers did, but I didn't say that."

22. It matters not, for purposes here, whether Sumner was correct in this belief. What matters is the likelihood that he could have believed, and did believe, that by settling the lawsuit he would be returning to full employment. If Sumner held that belief, it counteracts the notion that he switched positions about his ability to work immediately after settlement in order to get another bite at the apple. On such matters the court is

Furthermore, although detrimental reliance by another party, as was said earlier, is not an element of judicial estoppel, in equity the court must determine what is fair and just treatment of the parties before it. In this case, where Uniroyal took the position in the settlement petition, and maintained to the state judge, that Sumner could and would return to work, and then ultimately decided that Sumner was too severely disabled to qualify for employment with reasonable accommodation, Michelin should show greater humility about condemning anyone else's inconsistency. Had Uniroyal truly believed Sumner was ready and able to return to work in some meaningful capacity, surely, at some point between late 1991, and the commencement of this lawsuit, it would have found a position for him. Managers at Uniroyal continued to discuss potential jobs with Sumner, and to commission and review medical and vocational evaluations of his condition, up until December 1993, and even beyond. If the court is to be generous with Michelin, and grant that Uniroyal truly did not know throughout that period whether or not a suitable position would eventually be found for Sumner, then it should be no less generous with Sumner, who is the less sophisticated party.

### iii.

The final issue for the court is whether Sumner's application for Social Security disability benefits should bar his ADA claim. Sumner was told that, in order to apply for his retirement benefits as a totally disabled employee, he would first have to apply for Social Security benefits. The amount of his pension benefits would depend on whether he received Social Security. These applications postdated the relevant conduct in this lawsuit, which was Sumner's constructive termination, and thus are largely not determinative. Sumner's case depends on his ability to argue that he was a qualified individual with a disability when wrongfully terminated; not after he was terminated, and given the choice of seeking retirement and insurance benefits as someone with total disability, or receiving no salary at all.

Sumner's position regarding his disability was, at worst, ambiguous, but hardly so inconsistent and duplicitous that it warrants outright estoppel in this action. In addition, Sumner regularly attested to the fact that he relied on his attorney's counsel and language—thus any representations of total disability were not in his own words. Uniroyal also encouraged Sumner to apply for retirement disability and other benefits. Clearly, then, many of the other specific factors listed above by the court militate against estopping Sumner's ADA claim.

Sumner will not be judicially estopped from bringing this ADA action against Michelin.[23]

---

inclined to offer Sumner the benefit of the doubt, where reasonable doubt exists, because the effect of judicial estoppel is so stringent.

23. The court is certainly aware that by being so cautious to apply judicial estoppel, it is manifesting a preference for giving a case full hearing in the present, and only within that context, deciding what weight to attribute to the past conduct of the litigants. A harsher approach would perhaps be like that of the court in *Scarano v. Central R.R. of N.J.*, 203 F.2d 510 (3d Cir.1953), where a plaintiff who contended in a prior FELA action that he was totally disabled, and settled the suit for an amount in excess of lost Wages, was estopped from maintaining a suit for reinstatement a bare month after settlement, despite the fact that the first court never made a finding of fact regarding, or entered a final judgment in reliance upon a representation of, the extent of the plaintiff's disabilities. *Id.* at 512. Another example would be the case of *Cheatwood v. Roanoke Indus.*, 891 F.Supp. 1528 (N.D.Ala.1995).

There the court held that a plaintiff was estopped from claiming to be a 'qualified individual with a disability' because he had certified to the court and represented to the court that he was unable to perform his job, in order to collect worker's compensation. He was bound by his prior testimony in the workers' compensation case, and thus unable to make out a prima facie case under the ADA. *Id.* at 1538. *See also id.* at 1538 n. 14 (citing cases). But in *Cheatwood*, for example, the plaintiff testified before the judge in the worker's compensation case that he would be unable to perform any job, and the judge issued a ruling that he was 56% disabled—there was no settlement. Thus, on their facts, such cases could easily reach the result they did without advocating a broad reach for estoppel. By doing so, such cases raise a deeper question of at what stage an injured plaintiff should be required to make a binding decision about, or election of, remedies, and whether the court has or should have a free hand in making that determination.

## B. Time Limitation

[12] Both parties understood that the result of the meeting of December 17, 1993 was Sumner's effective or constructive (but unambiguous) termination from employment. First, there is no way to put a brave face on three years of unpaid leave of absence.[24] Second, Sumner, immediately after his last day at work, retained an attorney, who wrote to Uniroyal on December 29, 1993, stating that Sumner "has been given no explanation for his termination" and seeking an explanation "why [Sumner] is no longer employed"; and again on January 26, 1994, asserting that the "company has forced him out of his job and has refused to transfer him to another job." Third, Sumner acknowledges in his sworn deposition that the company finally told him in December 1993 that he "would not have a job anymore" and that he then understood that he was terminated and not ever going to be put back to work. Fourth, regarding Sumner's placement on extended leave of absence, his attorney wrote again to Uniroyal on February 21, 1994, telling the company that "Regardless of your terminology, the effect of the action you have taken against [Sumner] is the same as if you had terminated him" and that "It is, therefore, my position that you have effectively terminated his employment." The letter sought recovery for Sumner of "backpay to the date of his termination."

Sumner first contacted the EEOC to make a charge against Uniroyal by facsimile dated August 3, 1994, where he stated that his employer "constructively discharged" him in "late February or early March, 1994." Later, on the 'charge of discrimination' form provided by the EEOC, and signed by Sumner on November 9 of that year, he reported that the discrimination against him took place on March 31, 1994, and he did *not* check off the box marked "continuing action." However, at trial, Sumner was not able to adduce any reason for reporting either of these later dates as the relevant ones for purposes of calculating the 180 days, instead of the December 17, 1993 date.

In order to be timely, a charge must be filed with the EEOC within 180 days of the "alleged unlawful employment practice." 42 U.S.C.A. § 2000e–5(e)(1). Failure to file a charge before the statutory time elapses mandates dismissal of the action as untimely. *Ross v. Buckeye Cellulose Corp.*, 980 F.2d 648, 662 (11th Cir.1993), *cert. denied*, 513 U.S. 814, 115 S.Ct. 69, 130 L.Ed.2d 24 (1994). The filing period for a discrimination claim runs from the date a person becomes unequivocally informed of an adverse employment action or decision. *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1100 n. 19 (11th Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 435, 136 L.Ed.2d 332; —— U.S. ——, 117 S.Ct. 447, 136 L.Ed.2d 342 (1996); *see, e.g., Hottinger v. Contel of Ark., Inc.*, 65 F.3d 172 (8th Cir.1995) (ADA claim dismissed where limitations period calculated from date termination was first communicated to complainant). The preceding discussion of the evidence in the record leaves no doubt that Sumner knew on December 17, 1993, that he was being terminated. He was therefore required to file his EEOC charge by no later than mid-June, 1994. By contacting the EEOC for the first time on August 3, 1994, he missed the deadline, and his ADA action is therefore time-barred.

Sumner argues, alternatively, that because of his nominal status as an employee after December 27, 1993, the Uniroyal owed (and Michelin still owes) him an ongoing duty to place him in another job by making reasonable accommodation for his disabilities, which duty it has continued to violate; therefore, the date for filing his EEOC charge continues to be tolled. The previous discussion effectively undercuts that argument. Sumner admits that, as of December 1993, he had no expectation of ever going back to work for Uniroyal. An equitable exception to the filing deadline is permitted "where the unlawful employment practice manifests itself over time," rather than as a discrete action. *Hershey v. Praxair, Inc.*,

---

**24.** There was some discussion in a recorded conversation between Danford and Sumner that Sumner was put on leave for three years because that is how long he would be able to draw against his retirement pension under the terms of the collective bargaining agreement. It was therefore as permanent an action as permanent could be.

948 F.Supp. 29, 32–33 (S.D.Tex.1996) (ADA 'failure to promote' claim discharged because untimely and not susceptible of being an ongoing violation). But this continuing violation exception is not applicable on the facts of this case, where a clear and discrete action was taken in December of 1993, effectively ending Sumner's employment for good. Factors courts should consider for determining whether there is an ongoing violation include the subject matter and permanence of the discriminatory acts. *See Waltman v. International Paper Co.*, 875 F.2d 468, 475 (5th ·Cir.1989). Permanence is measured by whether the act should trigger an employee's awareness and duty to assert his rights, and whether the consequences of the act would continue absent an ongoing intent to discriminate. *Id.* at 476. Sumner was well enough aware he was terminated on December 17, 1993, that he hired counsel to assist him in trying to return to work. The consequences of his placement on long-term leave also continued without regard to Uniroyal's intent thereafter. Termination, like a failure to promote, is almost inevitably a discrete act whose effects are sustained without further discrimination. *See Berry v. Board of Supervisors of L.S.U.*, 715 F.2d 971, 981 (5th Cir.1983).

■ The fact that Sumner, through his attorney, several times sought reinstatement or reconsideration of the employment decision placing him on long-term leave had no effect on either tolling the deadline or transforming the decision into a continuing violation.[25] The Supreme Court wrote definitively that entertaining a grievance regarding an adverse employment decision does not introduce a note of tentativeness into that decision; "[n]or does the pendency of a grievance, or some other method of collateral review of an employment decision, toll the running of the limitations periods." *Delaware State College v. Ricks*, 449 U.S. 250, 251, 101 S.Ct. 498, 501, 66 L.Ed.2d 431 (1980). Sumner "cannot enlarge the period for filing a claim by a continuing barrage of argumentative pleas for relief beseeching the [employer] to agree with his interpretation of the laws and regulations governing his grievances." *Rice v. Albino*, 99 F.3d 1150 (table), 1996 WL 621979 *2 (10th Cir.). The fact that employment may continue under a contract after the employee is notified that tenure has been denied, even where termination is the "delayed, but inevitable consequence of that denial" does not make the violation a continuous one or toll the limitations period. *Ricks*, 449 U.S. at 257, 101 S.Ct. at 504. *See also Beavers v. American Cast Iron Pipe Co.*, 975 F.2d 792, 797 (11th Cir.1992). The same is true for Sumner's placement on long-term unpaid leave, where the inevitable result, whether sooner or later, could only be either exhaustion of his pension benefits or application for permanent disability benefits.

■ Sumner's final argument is that the ADA regulations themselves require an employer to continue to search for a position for a disabled employee. However, the Interpretive Guideline appended to the regulations at 29 C.F.R. Pt. 1630, states that there are three categories of reasonable accommodation: "These are (1) accommodations that are required to ensure equal opportunity in the application process; (2) accommodations that enable the employer's employees with disabilities to perform the essential functions of the position held or desired; and (3) accommodations that enable the employer's employees with disabilities to enjoy equal benefits and privileges of employment." 29 C.F.R. Pt. 1630, App. at p. 344. None of these categories applies to Sumner, or to any employee who has been effectively terminated because the employer has not found (at least ostensibly) any position that would reasonably accommodate that employee's disabilities. In other words, the employer has *already* made the threshold determination that the injured employee is not a qualified individual with a disability because it has found that employee unable to perform the essential duties of the job he once held, or any job he has sought. Whether that determination is right or wrong (and that is indeed

---

**25.** Counsel for Sumner also wrote to Danford at Uniroyal on February 21, 1994, and in that letter made reference to a meeting earlier that month between Sumner and Danford to once again review Sumner's employment status. That meeting did not in any way alter the status quo established on December 17, 1993.

the subject matter of this kind of case), the employer cannot be required to repeat the process over and over again and thereby either exacerbate its error or waste its resources redundantly proving the employee unable to perform any job that opens up, ad infinitum. If that were the case, then all violations of the ADA would be continuing ones. Congress has not so stated, and courts have not so found.

Reassignment to another, vacant position is also listed in the guideline as a possible accommodation. However, the example offered in the Interpretive Guideline is where an employer knows at the time the employee requests reassignment that a suitable position will open up within a week. *Id.* at p. 345. Whatever obligation Uniroyal had to explore this option, therefore, also dates from December 17, 1993, and therefore was violated, if ever, only on that date, Perusal of the regulations and guidelines makes it apparent that this last theory is intimately tied to the theory of an ongoing violation, insofar as it only applies if Sumner is to be considered an employee entitled to initiate dialogue with the employer about reassignment after being put on long-term leave of absence on December 17, 1993. Again, he is not.[26]

## IV. CONCLUSION

Because Sumner's claim was not timely filed, Michelin is entitled to a judgment as a matter of law. A separate judgment will be entered accordingly.

## JUDGMENT

In accordance with the memorandum opinion entered this date, it is the ORDER, JUDGMENT, and DECREE of the court:

(1) That the oral motion for judgment as a matter of law, filed by defendant Michelin North America, Inc. is granted; and

(2) That judgment is entered in favor of defendant Michelin North America, Inc. and against plaintiff Robert Sumner, with plaintiff Sumner taking nothing by his complaint.

It is further ORDERED that costs are taxed against plaintiff Sumner, for which execution may issue.

---

**26.** *See also Cheatwood v. Roanoke Indus.,* 891 F.Supp. 1528, 1539 (N.D.Ala.1995) ("[T]he EEOC merely recommends that the employer and employee engage in colloquy regarding possible accommodations, but does not statutorily require such conversations. 'It is important to note that the interactive process is triggered only if the employee is 'qualified'.... Thus the employer must necessarily make a threshold determination that the disabled employee may be accommodated and is, therefore, qualified within the meaning of the ADA.' *White [v. York Intern. Corp.],* 45 F.3d [357], 363 [(10th Cir.1995)].").