**United States Court of Appeals**

**FOR THE EIGHTH CIRCUIT**

‗‗‗‗‗‗‗‗‗‗

No. 96-3289

‗‗‗‗‗‗‗‗‗‗

Stella A. Dush,                                    *
                                                   *
          Plaintiff - Appellant,     *
                                                   *  Appeal from the United States
     v.                                            *  District Court for the District
                                                   *  of Nebraska.
Appleton Electric Company,        *
                                                   *
          Defendant - Appellee.   *

‗‗‗‗‗‗‗‗‗‗

Submitted:  March 14, 1997
    Filed:   August 28, 1997

‗‗‗‗‗‗‗‗‗‗

Before McMILLIAN, FLOYD R. GIBSON, and HANSEN, Circuit Judges.

‗‗‗‗‗‗‗‗‗‗

FLOYD R. GIBSON, Circuit Judge.

     Appellant Stella A. Dush filed this lawsuit against her former employer, appellee Appleton Electric Company ("Appleton"), claiming that Appleton fired[1] her in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101-12213

---

[1]In addition to the wrongful discharge claim, Dush also included in her Complaint a cause of action premised upon Appleton's alleged harassment of her.  The district court, however, granted the company's motion to dismiss the harassment count, and Dush does not challenge that decision on this appeal.

(1994 & Supp. I 1995).  On motion for summary judgment, the district court[2] ruled that Dush's characterization of herself as "totally disabled" in a previous workers' compensation proceeding estopped her from introducing evidence in this action that she was, for purposes of the ADA, a "qualified individual with a disability" at the time of her discharge.  Accordingly, the court reasoned that it would be impossible for Dush to establish a prima facie case of unlawful discrimination; it thus entered summary judgment in favor of Appleton, and this appeal followed.  Based on our conclusion that Dush has failed to demonstrate the existence of a genuine issue of material fact as to an essential element of her claim, we affirm the district court's judgment.

## I.  BACKGROUND

Dush injured her back at some uncertain time in December of 1991 while performing a "straight pack" job at Appleton's Columbus, Nebraska plant.  As a result, Dush contacted her family physician, Dr. Klutman, during January of 1992.  Dr. Klutman referred Dush for physical therapy to Columbus Community Hospital.  On doctor's orders, Dush was off work from January 7, 1992 until January 19, 1992, and throughout that period attended seven physical therapy sessions.  Dush's physical therapist, Terri Buck, released her to commence light duty work for four hours per day beginning January 21, 1992.  Appleton honored these restrictions and promptly transferred Dush to a part-time light duty job.

Upon returning to work, Dush found that her labors caused her to experience severe back pain.  Therefore, on January 27, 1992, she once again visited Dr. Klutman, and a CAT scan he ordered revealed a ruptured disc in Dush's lower spine.  Though Dush's treating physicians approved her to resume light duty work on February 10, 1992, the discovery of the ruptured disc prompted Dr. Klutman to refer Dush to a

---

[2]The HONORABLE WILLIAM G. CAMBRIDGE, Chief United States District Judge for the District of Nebraska.

neurosurgeon, Dr. John Fox, for treatment. Dr. Fox did not feel that Dush's ailment required surgery, so he, in turn, instructed Dush to see Dr. Antonio Manahan, a specialist in rehabilitative medicine, for conservative care.

Dush was again off work from March 3, 1992, the date of her first appointment with Dr. Manahan, until April 19 of that year. On April 19, Dr. Manahan cleared Dush to return to work for four hours per day with the restriction that she not lift more than five to ten pounds. In addition, Dr. Manahan suggested that, over time, Dush might attempt to increase her working hours from four to six and, eventually, eight per day. For the remainder of her tenure with Appleton, however, Dush was unable to regularly perform her job for shifts exceeding four hours.

Between May 1992 and January 1993, Dush submitted to physical exams by three doctors hired by Appleton. She saw Dr. Richard Cimpl on May 4, 1992, and she visited Dr. Michael O'Neil in October. Both of these orthopedic surgeons concurred in the course of treatment chosen by Dr. Manahan. But given Dush's minimal medical improvement over a significant period of time, Appleton asked her to consult Dr. Anil Agarwal on January 5, 1993. Following this appointment, Dr. Agarwal issued a report in which he advised the company that Dush could immediately start working six hour days and could, within two weeks, return to full eight hour shifts. At the same time, though, Dush's personal physician, Dr. Manahan, continued to recommend that she

work no more than four hours per day,[3] and Dush faithfully notified Appleton of Dr. Manahan's advice to her.

Despite her knowledge of the contents of Dr. Agarwal's report, and based upon Dr. Manahan's contradictory instructions, Dush maintained her schedule of four hour work days. On March 1, 1993, Dush's supervisors informed her that if she did not begin working eight hours per day she would be subject to disciplinary action under Appleton's absentee policy. Dush still declined to undertake a customary working schedule. Consequently, in reliance upon Dr. Agarwal's conclusions, the company disciplined Dush in four progressive steps, beginning with an employee consultation on March 18, 1993, and ending with her discharge for absenteeism on May 21, 1993.

On October 19, 1993, Dush filed with the Nebraska Workers' Compensation Court a petition seeking an award of temporary total disability benefits and recovery of medical expenses resulting from the back injury she suffered while employed at Appleton, which was named as the defendant. In her petition, Dush alleged that an accident on January 6, 1992 rendered her "temporarily and totally disabled." Appellant's App. at 214. To support her claim, Dush submitted to the court, inter alia, a "Vocational Evaluation and Earning Capacity Assessment" prepared by North Central Rehabilitation, Inc. This report summarized Dush's subjective complaints of pain as follows:

---

[3]It appears that Dush experienced considerable discomfort even when she adhered to the restrictions Dr. Manahan placed upon her. Via deposition testimony, Dr. Manahan disclosed that Dush, during a May 19, 1992 appointment with him, indicated that her "first two hours [of work were] comfortable but the second or the succeeding -- the rest of the two hours she was having a lot of pain." Appellant's App. at 374. This point is reinforced by reference to a letter penned by Dr. Manahan on February 11, 1994. In that correspondence, the physician mentioned that Dush had "a lot of problems" with her light duty job. Id. at 226.

> Regarding physical abilities and limitations, the injured worker indicated that she experiences pain following standing for 10-15 minutes, is unable to climb stairs, unable to bend, cannot reach when it requires her to bend her back, experiences numbness in her legs and feet when sitting, has difficulty walking, except with a grocery cart that she uses for support when grocery shopping, can only lift a maximum of 5-10 pounds, without twisting, bending and stooping and is unable to drive because of her inability to use foot pedals.

Id. at 217-18.  Not surprisingly, the author of the assessment, Gail Leonhardt, surmised that Dush was "unemployable" when she lost her job at Appleton.  Id. at 220.

The workers' compensation court agreed.  Following an adversarial hearing, the court determined that Dush was temporarily totally disabled and awarded her medical expenses and appropriate benefits for (1) certain periods of time while she was employed at Appleton, but on medical leave, (2) a period spanning from the date of her termination until the date of the hearing, and (3) "thereafter and in addition thereto, . . . for so long in the future as [Dush] shall remain totally disabled as a result of said accident and injury."[4]  Id. at 73.  In approving this award, the court took note of the fact that Dush had worked for some time in a light duty, reduced hours job at Appleton.  Nonetheless, the presiding officer resolved that, given Dush's "pain and continuing treatment," she would be "unable to continue this light duty employment on any long term sustained basis." Id. at 71.

In early 1995, Dush initiated this suit against Appleton, alleging that the company violated the ADA by "discriminating" against her because of her back injury.  Specifically, Dush claimed that the company failed to provide her with appropriate

---

[4]Indeed, at oral argument in this appeal, Appleton's attorney informed the panel that Dush at that time continued to receive total disability benefits.

accommodations, wrongfully terminated her due to her disability,[5] and harassed her. Elaborating upon her claim of harassment, Dush alleged that Appleton's behavior caused her to overextend her physical abilities, "which resulted in her complete, total and permanent disability." Id. at 3. Dush further explicated that she had "sustained significant physical injury resulting in her permanent disability," id. at 3-4, and she sought relief by way of, among other things, compensation for her "loss of earnings because of her permanent and total disability, and her loss of wages throughout [her] working life," id. at 4.[6]

On motion for summary judgment, Appleton asserted that Dush could not recover because she would be unable to prove that she was, at the time of her discharge, a "qualified individual with a disability" under the ADA. In particular, through arguments founded upon principles of collateral and judicial estoppel, Appleton averred that Dush's representations and pleadings of total disability before the Nebraska Workers' Compensation Court and the district court[7] precluded her from establishing

---

[5]The district court and the parties have evidently treated the "failure to accommodate" and "wrongful discharge" grounds for relief as one and the same, so we will do likewise.

[6]During questioning at her deposition, Dush testified that she agreed with the representation in her Complaint that she had sustained an injury "which resulted in her complete, total, and permanent disability." Appellant's App. at 194-95.

[7]Appleton buttressed its motion with the allegations of total disability contained in Dush's Complaint, and the company also adverted to certain statements Dush made in her deposition in this case. For example, when asked whether she agreed "with the workers' comp[ensation] decision that [she was] totally disabled from the time of [her] discharge on May 21[, 1993] through the date of th[e workers' compensation] award," Appellant's App. at 177, Dush responded, "Yes, I think so," id. at 178.

In an eleventh hour affidavit submitted in opposition to Appleton's motion for summary judgment, Dush insisted that, as a layperson, she had "no information or knowledge as to the legal definition of th[e] term 'total disability[.']" Id. at 30. At the deposition itself, however, Dush confirmed that she understood "total disability" to mean that she "couldn't work at all." Id. at 192-93.

that she could perform the essential functions of her job with or without reasonable accommodation.

By a Memorandum Opinion and Order dated August 1, 1996, the district court granted Appleton's motion for summary judgment. Finding persuasive the company's arguments, the court ruled that "an individual who has previously claimed to be totally disabled should be estopped from later claiming to be a 'qualified individual with a disability' during the time period in which that individual claimed to have been totally disabled." Appellant's App. at 49. Dush's disagreement with this proposition resulted in her timely perfection of this appeal. While we find it unnecessary in the present matter to adopt a concrete position on the estoppel theory embraced by the district court, we affirm because we conclude that Dush has failed to proffer genuine issues of material fact sufficient to overcome Appleton's summary judgment motion.

## II.  DISCUSSION

In her brief, Dush takes care to remind us that Congress enacted the ADA to counteract "the continuing existence of unfair and unnecessary discrimination and prejudice [which] denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous." 42 U.S.C. § 12101(a)(9) (1994). Appleton does not, and cannot, dispute this laudable purpose of the Act. When interpreting remedial statutes, however, it is invariably necessary to temper generalized recitations of legislative purpose with the precise language used to define a law's parameters. This appeal is illustrative. To be sure, Congress passed the ADA in a noble effort to eradicate the widespread and senseless discrimination which had for so long persisted against those perceived to be "disabled." Nevertheless, a court of law must venture beyond such sweeping

abstractions and ask various questions which, without a doubt, will fail to produce the sort of emotional thunder often engendered by broadly worded statements of remedial intent, but which are indispensable to a meaningful application of a statute. One query requires us to ponder who, in fact, are the intended beneficiaries of a law; in the context of the ADA, we must consider who, exactly, are those persons against whom Congress desired to prevent discrimination. As is usually so, Congress has provided the answer in the language of the statute itself: The ADA was designed to prevent an employer from discriminating against "a qualified individual with a disability." 42 U.S.C. § 12112(a) (1994). Congress has supplied even further direction by explaining that a qualified individual with a disability is a person "with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." Id. § 12111(8).

Naturally, then, the courts have required an ADA plaintiff to prove as part of her prima facie case that she does, in fact, fall within the class of individuals created by these definitional requirements. See, e.g., Price v. S-B Power Tool, 75 F.3d 362, 365 (8th Cir.) (listing components of prima facie case), cert. denied, 117 S. Ct. 274 (1996). In granting Appleton's motion for summary judgment, the district court determined that Dush's cause of action foundered on this very point. That is, the court believed that Dush could not succeed on her claim because she would be unable to prove that she could, with or without reasonable accommodation, perform the essential functions of her job at Appleton. Underlying the district court's analysis was the fact that Dush had previously represented to the Nebraska Workers' Compensation Court that she was totally disabled and unemployable. According to the court, because she made those allegations before the state administrative tribunal, Dush would be estopped from introducing evidence at trial that she could, after all, perform the essential functions of her job at Appleton. Thus, her suit would necessarily fail due to a dearth of proof on a fundamental element of her prima facie case.

By grounding its order granting summary judgment in principles of estoppel, the district court bounded headlong into what has recently become a hotly litigated and contentious issue. A significant number of federal courts have, like the district court, decided that a person who characterizes herself as "totally disabled" in order to receive state, federal, or even insurance benefits will normally be estopped from proving that she is a qualified individual with a disability within the meaning of the ADA or similar state laws. See, e.g., McNemar v. Disney Store, Inc., 91 F.3d 610, 616-21 (3d Cir. 1996) (deciding that district court did not abuse its discretion when it applied judicial estoppel as a per se bar to prevent a disability claimant with AIDS from proving she was a qualified individual with a disability), cert. denied, 117 S. Ct. 958 (1997); Lowe v. Angelo's Italian Foods, Inc., 966 F. Supp. 1036, 1037 (D. Kan. 1997) ("[W]hen an employee represents that he or she is totally disabled in order to receive disability benefits, that employee is estopped from claiming that he or she can perform the essential function of the job with or without reasonable accommodation."); Thomas v. Fort Myers Hous. Auth., 955 F. Supp. 1463, 1466 (M.D. Fla. 1997) (applying equitable estoppel where ADA plaintiff had received social security benefits based on representation that he was "totally disabled"); Violette v. International Bus. Machs. Corp., 962 F. Supp. 446, 449 (D. Vt. 1996) ("A finding of . . . a disability [for social security purposes] estops a plaintiff from claiming he is a 'qualified individual.'"), aff'd, 116 F.3d 466 (2d Cir. 1997). Different courts have positioned themselves on the other side of this dispute, holding that one who represents herself as "totally disabled" for purposes extraneous to the ADA should still have an opportunity to recover under that statute. See, e.g., Swanks v. Washington Metro. Area Transit Auth., 116 F.3d 582, 584-87 (D.C. Cir. 1997) (agreeing with both the Social Security Administration and the Equal Employment Opportunity Commission that the receipt of social security disability benefits does not stand as an absolute bar to ADA claims); Sumner v. Michelin N. Am., Inc., No. CIV. A. 96-T-313-E, 1997 WL 329588, at *7 (M.D. Ala. June 13, 1997) ("[A] person may be totally and permanently disabled for workers' compensation purposes and yet still be able to perform a position's essential functions with or without reasonable accommodation."); Mohamed v. Marriott Int'l, Inc., 944 F.

Supp. 277, 281-84 (S.D.N.Y. 1996) (deeming it inappropriate to utilize judicial estoppel because, among other factors, differences exist in definitions employed by the relevant statutes); Smith v. Dovenmuehle Mortgage, Inc., 859 F. Supp. 1138, 1142 (N.D. Ill. 1994) (commenting that use of judicial estoppel under similar circumstances would "place plaintiff in the untenable position of choosing between his right to seek disability benefits and his right to seek redress for an alleged violation of the

ADA"). Our approach to this issue is less than clear,[8] and we do not find

_____

[8]Approximately one year ago we issued two opinions which, at first blush, would appear to make it significantly more difficult to hold that judicial estoppel will, as a per se rule, prevent a person who has claimed to be totally disabled from subsequently proving that she is a qualified individual with a disability. In the most notable of these decisions, Robinson v. Neodata Servs., Inc., 94 F.3d 499, 501-02 (8th Cir. 1996), we rejected the ADA claimant's contention that her status as "totally disabled" for purposes of social security benefits proved as a matter of course that she was "disabled" under the ADA. We observed, "Social Security determinations . . . are not synonymous with a determination of whether a plaintiff is a 'qualified person' for purposes of the ADA. At best, the Social Security determination was evidence for the trial court to consider in making its own independent determination." Id. at 502 n.2 (citation omitted); see also Eback v. Chater, 94 F.3d 410, 412 (8th Cir. 1996) (quoting with approval a statement from the Associate Commissioner of Social Security declaring that "the ADA and the disability provisions of the Social Security Act have different purposes and have no direct relationship to each other").

Less than five months after releasing the Robinson and Eback decisions, we rendered an opinion in Budd v. ADT Sec. Sys., 103 F.3d 699 (8th Cir. 1996) (per curiam). In that case, we indicated that the district court had properly applied estoppel to preclude an ADA claimant from proving he could perform the job in question where, in applying for social security and disability insurance benefits, the claimant "made representations about his own physical abilities that [were] completely at odds with the theory of his lawsuit." Id. at 700; cf. Beauford v. Father Flanagan's Boys' Home, 831 F.2d 768, 771-72 (8th Cir. 1987) (deciding only that § 504 of the former Rehabilitation Act did not cover those who, without question, could no longer perform their jobs), cert. denied, 485 U.S. 938 (1988).

Because we determine that summary judgment was otherwise justified, it would be unwise at this juncture for us to attempt to reconcile these cases. Instead, we leave for another day the question of whether and to what extent judicial estoppel, or some other form of estoppel, will operate to prohibit someone who has formerly claimed to be "totally disabled" from making out a prima facie ADA case. We do find it necessary to mention, with due respect to the D.C. Circuit, that we do not think this Court has, as yet, firmly entrenched itself within any of the camps of divergent opinions on this issue. See Swanks, 116 F.3d at 586 (suggesting this Court has held that the receipt of

it necessary, for instant



disability benefits does <u>not</u> preclude subsequent ADA relief).  As we see it, the issue, at least for the time being, remains open in our Circuit.

purposes, to authoritatively define our stance on the matter. Rather, we affirm the district court's entry of summary judgment pursuant to principles which have more general application to rulings of that sort. See Kennedy v. Applause, Inc., 90 F.3d 1477, 1481 n.3 (9th Cir. 1996) (regarding it unnecessary to consider judicial estoppel where there was no genuine issue of material fact relating to pertinent issue).

It is axiomatic that summary judgment is warranted only if, "after viewing the evidence in the light most favorable to the nonmoving party, there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." F.D.I.C. v. Bell, 106 F.3d 258, 263 (8th Cir. 1997). After the moving party has fulfilled its burden of identifying the portions of the record which demonstrate an absence of a genuine issue of material fact, the nonmoving party must "'set forth specific facts showing that there is a genuine issue for trial.'" Handeen v. Lemaire, 112 F.3d 1339, 1346 (8th Cir. 1997) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)). To avoid the entry of an adverse judgment, it is incumbent upon the nonmoving party to support its case with "more than a scintilla of evidence." Bell, 106 F.3d at 263 (quotation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quotation omitted).

In evaluating whether a genuine issue of material fact exists to show that a person was, at relevant times, a qualified individual with a disability, special attention must be given to the circumstances surrounding the case. Where, as here, the party opposing the motion has made sworn statements attesting to her total disability and has actually received payments as a result of her condition, the courts should carefully scrutinize the evidence she marshals in an attempt to show she is covered by the ADA. The burden faced by ADA claimants in this position is, by their own making, particularly cumbersome, for summary judgment should issue unless there is "strong countervailing evidence that the employee . . . is, in fact, qualified." Mohamed, 944 F. Supp. at 282. Typically, "the prior representations [of total disability] carry sufficient weight to grant summary judgment against the plaintiff." Id.; see also Kennedy, 90 F.3d at 1481 (finding summary judgment proper, and avoiding judicial estoppel question, where ADA claimant, who had professed to be "totally disabled" for other purposes, resisted summary judgment with deposition testimony that was "uncorroborated and self-serving"); August v. Offices Unlimited, Inc., 981 F.2d 576, 581-84 (1st Cir. 1992) (failing to discern a genuine issue of material fact in analogous situation).

Turning at last to the record before us, and reviewing the entry of summary judgment de novo, see Handeen, 112 F.3d 1347, we decide that the district court properly concluded there was no genuine issue of material fact as to whether Dush was a qualified individual with a disability on the date of her termination. The evidence presented by Appleton in support of its motion was, to say the least, compelling. Not only had Dush previously labeled herself as "totally disabled" and been adjudicated as such by the Nebraska Workers' Compensation Court, but her Complaint in this very case also averred that Appleton's conduct resulted in her "complete, total and permanent disability." Cf. Garman v. Griffin, 666 F.2d 1156, 1158 (8th Cir. 1981) ("Where a party has made a statement in a pleading about his own conduct which is at variance with his position in the matter being litigated, the evidence is generally admitted."). Pertinent medical records are consistent with these representations.

-14-

Dush's personal physician, Dr. Manahan, reported that Dush had "a lot of problems" even in light duty employment, and the author of a "Vocational Evaluation and Earning Capacity Assessment" regarded Dush as "unemployable" when she lost her job at Appleton. On top of this evidence, which in itself is substantial, lies Dush's sworn testimony during her deposition for this case. In that proceeding, Dush agreed with the state workers' compensation court that she was totally disabled from the time of her discharge, and she additionally stated that her Complaint correctly described her as completely disabled.

To counter these damaging facts, Dush first maintains that she satisfactorily performed her job until the time that she was fired. Though this circumstance assuredly has some relevance to the appeal sub judice, its significance pales in comparison to the contrary evidence collected by Appleton. In any event, in a case like this one, where wrongful discharge is the focus of our inquiry, the key concern is whether the employee was a qualified individual at the time of her termination. See August, 981 F.2d at 583 (finding "no merit" in contention that relevant date in wrongful discharge action should be some time other than the date of termination). The overwhelming majority of medical records and other evidence show that Dush was completely unable to work as of the day of her discharge. Though it is admirable that Dush continued to press on through what apparently was substantial pain, her personal doctor verifies that she did so only with "a lot of problems." Based on the record as a whole any rational trier of fact would inevitably decide that by May 21, 1993, Dush had, as a practical matter, persisted as long as possible and finally found

-15-

it necessary to succumb to the ailment that beset her.[9]  The Nebraska
Workers' Compensation Court, health care professionals,

---

[9]In reaching this conclusion, we are not unmindful of the fact that Appleton fired Dush due to her refusal to assume more hours per day.  But just because the company incorrectly believed, based on Dr. Agarwal's report, that Dush could return to work does not mean that she truly was a qualified individual with a disability.  Indeed, Dr. Agarwal's assessment was not materially different from the evaluation of every other doctor who had treated Dush -- all encouraged her to gradually return to a normal working schedule.

Still, it is our task to decide whether any rational juror could find that Dush was a qualified individual with a disability on May 21, 1993.  As to that point in time, the evidence is almost uniform that Dush was not qualified under the ADA, but was rather "totally disabled" and "unemployable."  Cognizant of the enhanced burden Dush faces under the present circumstances, we hold that she has not advanced "strong countervailing evidence" that would cause reasonable minds to differ over whether she was able to perform the essential functions of her job, with or without accommodation, on the date of her discharge.

and Dush herself are in accord that she was "totally disabled" and "unemployable" as of that date, and Dush has not come forth with "strong countervailing evidence that [she was], in fact, qualified." Mohamed, 944 F. Supp. at 282.

Dush also contends that we should discount the statements she made in her deposition because she is a layperson with "no information or knowledge as to the legal definition of th[e] term 'total disability[.']" Appellant's App. at 30. The force of Dush's assertion does not escape us, and we cannot rule out the possibility that, in a proper situation, we might see fit to look past a nonlawyer's unknowing and unintended concession on a discrete question of law. This, however, is not that case. Dush's knowledge of the exact legal definition of the term "total disability" is irrelevant in light of further testimony she gave at her deposition. Importantly, she indicated that she believes the phrase to mean that she "couldn't work at all." Thus, notwithstanding Dush's alleged ignorance of the law, the transcript of her deposition reveals that she defines the term in a manner completely at odds with the concept of being a qualified individual with a disability. As such, we are comfortable that Dush possesses a clear enough understanding of "total disability" to justify holding her to her admission.

Finally, Dush posits that being "totally disabled" for purposes of Nebraska's workers' compensation law has no bearing on the question of whether she is a qualified

-17-

individual with a disability.[10]  This is because the ADA includes the concept of "reasonable accommodation," whereas workers' compensation law does not.  Cf. Sumner,  1997 WL 329588, at *7 ("[A] person may be totally and permanently disabled for workers' compensation purposes and yet still be able to perform a position's essential functions with or without reasonable accommodation.").  According to Dush, she could have been totally disabled under Nebraska law, but still have been able to perform the essential functions of her job with a reasonable accommodation (namely, reduced hours).[11]  Compare 42 U.S.C. § 12112(a), (b)(1)(5)(A) (1994) (clarifying that a "covered entity" must provide "reasonable accommodations" for qualified individuals with disabilities), with Heiliger v. Walters & Heiliger Elec., Inc., 461 N.W.2d 565, 574 (Neb. 1990) ("Total disability may be found in the case of workers who, while not altogether incapacitated for work, are so handicapped that they will not be employed regularly in any well-known branch of the labor market.  The essence of the test is the probable dependability with which claimant can sell his services in a competitive labor market, undistorted by such factors as business booms, sympathy of a particular employer or friends, temporary good luck, or the superhuman efforts of the claimant to rise above his crippling handicaps." (quotation and alteration omitted)).  The problem with this contention, however, is that the workers' compensation court addressed the

_____

[10]Of course, this argument cannot explain away other, equally incriminating, items of evidence, such as Dush's inclusion within her ADA Complaint of an averment that she is completely, totally, and permanently disabled.

[11]Assuming this is true, it creates somewhat of a paradox for Dush.  For, on the one hand, she seeks to take refuge in the precise definition of "total disability" under Nebraska law, with the term's accompanying exceptions.  At the same time, though, she asks to be released from her admission on this point because she was not, in actuality, aware of this definition.  We realize that Dush might have intended to proffer these arguments in the alternative (that is, even if Dush admitted in her deposition that she was totally disabled, it should not affect her ability to recover under the ADA).  Nonetheless, we cannot help but be troubled by this inherent inconsistency, particularly when it arises within a case which itself suggests an attempt to succeed on a theory which conflicts with a party's previous position.

issue of shorter shifts and specifically ruled that Dush was "unable to continue this light duty employment on any long term sustained basis." At least in this case, then, the workers' compensation proceedings in Nebraska did, indeed, take into account the only reasonable accommodation which Dush now asserts would have allowed her to perform her job. Consequently, the state administrative tribunal's characterization of Dush as "totally disabled" was equivalent to a finding that she was not qualified under the ADA.

Essentially, Dush has attacked the evidence against her on a number of fronts, advancing diverse arguments in support of her theory that certain aspects of the record are of minimal probative value. As discussed above, while some of Dush's claims are, in principle, sound, they are weakened by the circumstances of this case. In any event, even were we to disregard one or the other piece of evidence Appleton has proffered, the record as a whole would remain sufficient to justify summary judgment. In the end, despite Dush's valiant attempts to refute the wealth of facts showing that she was not a qualified individual with a disability, the evidence she has mustered does not represent "strong countervailing evidence" sufficient to defeat summary judgment. The record as a whole could not give rise to a genuine issue of material fact on the question of whether Dush, "with or without reasonable accommodation, [could] perform the essential functions of [her job at Appleton]." 42 U.S.C. § 12111(8). As a result, the district court correctly entered summary judgment in favor of the company.

## III.  CONCLUSION

Because Dush has failed to establish a genuine issue of material fact on an essential element of her prima facie case, we affirm the district court's judgment.

AFFIRMED.

A true copy.

-19-

Attest:

          CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.