# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-2774

_____

David Hughes,                              *
                                           *
          Plaintiff - Appellant,           *
                                           *
     v.                                    *
                                           *   Appeal from the United States
Roger D. Stottlemyre, Colonel, in his      *   District Court for the Western
official capacity; James P. Ripley, as an  *   District of Missouri.
individual and in his official capacity;   *
Eric Wilhoit, as an individual and in      *
official capacity; Vincent Ellis,          *
                                           *
          Defendants - Appellees.          *

_____

Submitted: January 13, 2006
      Filed:  July 19, 2006

_____

Before BYE, HEANEY, and COLLOTON, Circuit Judges.

_____

BYE, Circuit Judge.

     David Hughes was a sergeant with the Missouri State Highway Patrol (Patrol) until May 2004, when he was demoted by Colonel Roger D. Stottlemyre to trooper and transferred to the Patrol's Gaming Division. Hughes brought a 42 U.S.C. § 1983 action, naming his immediate supervisors, Captain Vincent Ellis and Lieutenant James Ripley, as well as Eric Wilhoit, an investigator in the Patrol's Professional Standards Division. Hughes claims Ellis, Ripley and Wilhoit violated his First Amendment free

speech rights by retaliating against him for opposing proposed changes in Patrol policy. Hughes named Stottlemyre in his official capacity as Patrol Superintendent but does not contend he personally retaliated against him.

The district court dismissed Hughes's claims finding he failed to present any evidence tending to discredit the legitimate non-retaliatory reasons offered for his demotion and transfer. On appeal, Hughes contends the district court applied the wrong test in evaluating his retaliation claim, and granted summary judgment on a basis not asserted by defendants. We affirm in part, reverse in part, and remand.

I

The facts, viewed in the light most favorable to Hughes, Dush v. Appleton Elec. Co., 124 F.3d 957, 962-63 (8th Cir. 1997) (summary judgment standard), are as follows. In 2003, Hughes was a Zone Sergeant assigned to Bates County, Missouri. His direct supervisor was Lieutenant Ripley who served in a supervisory role in Bates County and Cass County, Missouri. Bates County and Cass County are located within the boundaries of the Patrol's Troop A, which was commanded by Captain Ellis. In June 2003, Hughes was told the Patrol was considering consolidating Bates and Cass counties. Hughes attended a meeting with Ellis and Ripley to discuss the proposed consolidation and expressed disagreement. To support his position, Hughes gathered statistics and other information tending to show the change would increase trooper response time and adversely impact public safety. As an alternative, Hughes suggested one trooper from Bates County be reassigned to Cass County to relieve its personnel problems. Ellis and Ripley favored consolidation, and Ripley voiced dissatisfaction with Hughes's alternative plan. Following the meeting, Ellis chose to delay consolidation and temporarily adopted Hughes's suggestion.[1] Following the

---

[1]In October 2003, the consolidation plan was adopted over Hughes's objections.

meeting, Ripley was visibly angry at Hughes, and it is at this point, according to Hughes, Ellis and Ripley began a campaign of retaliation.

Hughes alleges in the months following the meeting, Ripley repeatedly summoned him to Ripley's office approximately forty-five miles away. Prior to the meeting, Hughes had been called to Ripley's office on only one occasion. Additionally, within a month of the meeting Hughes received two verbal reprimands. One for arriving at work too early and a second for using sick leave while his father was dying of cancer. During this same time, Hughes alleges Ripley told him he disliked him.

Hughes further alleges Ripley and Ellis retaliated by giving him a performance evaluation decidedly more negative than those he had received for the preceding two years. In 2001, his performance was ranked between "Meets Expectations" and "Excels" in all categories, and the comments section contained primarily positive comments. In 2002, his performance was again ranked between "Meets Expectations" and "Excels," but the comments section carried some negative comments, including: "Sergeant Hughes has become almost consumed with the notion that he is going to be transferred to another division of the patrol." In 2003, after the consolidation plan was adopted, Hughes's performance evaluation indicated he "Meets Expectations" or "Excels," but carried additional negative comments directed at specific instances of conduct. Among other comments, the evaluation stated: "If Sergeant Hughes does not heed the suggestions he has been given the troop staff will have to give serious consideration to his ability to be able to function in a supervisory role." Hughes appealed the 2003 evaluation to Ellis, who rejected the appeal and advised him to improve his job performance.

Next, Hughes contends a policy instituted by Ripley to have subordinates evaluate their sergeants was retaliatory because Ripley discounted negative comments directed at other sergeants, while relying on those directed at him.

-3-

Hughes also contends four disciplinary complaints initiated in 2004 were brought in retaliation for his criticism of the consolidation plan. The first involved an incident on December 13, 2003, when a trooper under Hughes's supervision shot across a Missouri highway to kill a coyote and trespassed on private land to retrieve it. The complaint, initiated by Corporal Kevin Fisher who was under Hughes's supervision, alleged Hughes told him to report the incident to Ripley but not to volunteer any details. Additionally, the complaint alleged Hughes advised the trooper not to talk with investigators without having a lawyer present.

The second complaint, alleged Hughes ordered an on-duty trooper to transport his children to and from school on various occasions between 2001 and 2003. The complaint further alleged Hughes had from time to time used his patrol car to transport his children to and from school. No complaint was leveled at the trooper who transported Hughes's children.

The third complaint, alleged Hughes, at the behest of state senator Harold Caskey, ordered one of his troopers to retrieve license plates from a private vehicle being held at an impound lot. The owner of the lot had not been paid for the towing or storage charges and complained to Hughes. When interviewed by the investigator, the owner stated Hughes was rude and told him not to "mess with Senator Caskey."[2]

Finally, the fourth complaint involved an incident on March 22, 2004, when Hughes entered Fisher's residence to retrieve the keys to Fisher's patrol vehicle. Hughes's patrol vehicle had been damaged in a collision with a deer en route to a serious traffic accident and he needed a substitute. Fisher was off duty and his patrol vehicle was parked at his home only a few miles away. Hughes drove to Fisher's home, and, when he discovered Fisher was not there, entered the locked home using

_____

[2]Senator Caskey is an attorney and represented Hughes in connection with the first two complaints filed against him. After the third complaint was filed, Hughes was ordered to have no further contact with Caskey.

-4-

the keypad access code and located the vehicle keys. Fisher admitted giving Hughes the access code to his home on a previous occasion but indicated he had not otherwise given Hughes permission to enter his home.

Each of these complaints was initiated based on information provided by Fisher but was signed by either Ripley or Ellis because Patrol rules do not permit a subordinate to sign a complaint involving a superior. Each of the instances of alleged misconduct was investigated by Wilhoit in his role as an investigator with the Professional Standards Division of the Patrol. In each instance, Wilhoit interviewed Hughes who admitted much of the factual basis underlying each complaint. Nevertheless, Hughes contends Ripley and Ellis used the complaints as an opportunity to retaliate against him, and enlisted the aid of Wilhoit to further their plan.

As further evidence of retaliation, Hughes alleges in September 2003, Ripley solicited one of Hughes's subordinates for negative information about Hughes, and told Hughes if there was any way to reassign him he would. In March 2004, Hughes alleges Ripley approached another patrol member about accepting a promotion to Bates County and replacing Hughes as Zone Sergeant. In April 2004, Ripley removed Hughes from the state fair detail; a position Hughes had held for twelve years.

Finally, Hughes alleges he was retaliated against when he was 1) refused a position as a narcotics officer, 2) required to work more Wednesdays and Sundays, and 3) docked 3.5 hours compensatory time for attending a training session out of uniform.

On March 25, 2004, Hughes filed this action against Stottlemyre, Ripley and Wilhoit, alleging these actions constituted adverse employment actions taken in response to his opposition to the consolidation plan. In early May 2004, Stottlemyre convened a staff meeting, which included a Lieutenant Colonel, five majors, Wilhoit, Ellis and Ripley, to determine whether any disciplinary action should be taken in

response to the complaints. Wilhoit and Ripley were not asked to make a recommendation as to discipline. Ellis and all but one of the remaining officers in attendance recommended termination. Stottlemyre initially agreed, but reconsidered and chose to demote Hughes and transfer him to the Gaming Division. Ellis complained to Stottlemyre that Hughes should be terminated and insisted he be prohibited from returning to Troop A. On May 11, 2004, Hughes filed an amended complaint adding Ellis as a defendant, and alleging the four complaints which caused his demotion and transfer were punishment for his exercise of protected speech.

The defendants moved for summary judgment arguing Hughes failed to make out a prima facie case of retaliation. As to the four complaints which Hughes alleges led to his demotion and transfer, the district court assumed Hughes had made a prima facie showing of retaliation against Ellis, Ripley and Wilhoit. The court concluded, however, Hughes failed to show that the legitimate non-retaliatory reason given by Stottlemyre for his demotion and transfer, i.e., the complaints, was pretextual. As to the other alleged adverse employment actions, the district court concluded Hughes failed to make a prima facie showing. On appeal, Hughes argues the district court 1) applied the wrong test for determining whether he had made a prima facie showing of retaliation, and 2) erred in reaching the issue of pretext because the defendants only argued he failed in his prima facie showing.

II

We review the district court's grant of summary judgment de novo. Spears v. Mo. Dep't of Corr. & Human Res., 210 F.3d 850, 853 (8th Cir. 2000). "Summary judgment is proper where the evidence, when viewed in the light most favorable to the nonmoving party, indicates that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law." Id.

A.      Prima Facie Case

To establish a prima facie case of retaliation based on the First Amendment, a plaintiff must allege and prove he engaged in conduct protected by the First Amendment and the protected conduct was a substantial or motivating factor in the employer's decision to take the adverse employment action.  Mt. Healthy City Sch. Dist. v. Doyle, 429 U.S. 274, 287 (1977); Okruhlik v. Univ. of Ark., 395 F.3d 872, 878 (8th Cir. 2005) (noting the same test applies to both First Amendment and Title VII retaliation cases).  If the employee makes a successful prima facie showing, the burden shifts to the employer to demonstrate the same action would have been taken even in the absence of the protected conduct.  Mt. Healthy, 429 U.S. at 287.  This is the test the district court applied.  Accordingly, we reject Hughes's claim the district court applied the wrong standard.

1.      Protected Activity

The district court concluded Hughes's opposition to the consolidation plan was protected activity because he expressed concerns over the impact to public safety.  On appeal, defendants do not contest the district court's holding.  Thus, we assume, without deciding, that Hughes's stated opposition to the consolidation plan was protected under the First Amendment.

2.      Adverse Employment Action

To constitute an adverse employment action, the employer's decision must effect a material change in the terms or conditions of employment.  Bechtel v. City of Belton, 250 F.3d 1157, 1162 (8th Cir. 2001).  Hughes alleges his 2003 performance evaluation constitutes an adverse employment action.  The district court rejected the contention because Hughes failed to present any evidence showing it resulted in any

material change to the terms or conditions of his employment. We agree. Hughes has presented no evidence tending to show the evaluation was relied upon to effect any material change in the terms or conditions of his employment. See Spears, 210 F.3d at 854 (holding a negative performance review is not in itself an adverse employment action, and is actionable only if the employer subsequently uses the review to alter the terms or conditions of employment to the detriment of the employee.) Therefore, we conclude the 2003 performance review does not constitute an adverse employment action.

The district court also concluded Hughes's complaints about working Sundays and Wednesdays, and the policy requiring troopers to review their sergeants, did not constitute adverse employment actions because Hughes failed to allege any impact on the terms or conditions of his employment. Hughes does not respond directly to the district court's findings. Instead, he agues we should view his allegations cumulatively and find in sum they are sufficient to allege an adverse employment action. We disagree.

Although actions short of termination may constitute adverse employment actions within the meaning of the statute, "not everything that makes an employee unhappy is an actionable adverse action." Montandon v. Farmland Indus., Inc., 116 F.3d 355, 359 (8th Cir. 1997). We have held a reasonable jury could conclude negative references to potential employers constitutes sufficient adverse action to state a retaliation claim. Smith v. St. Louis Univ., 109 F.3d 1261, 1266 (8th Cir. 1997). Conversely, we have also held the loss of status and prestige that accompanied replacement of a supervisor's staff, when her salary and position remained the same, did not constitute a sufficient adverse employment action. Ledergerber v. Stangler, 122 F.3d 1142 (8th Cir. 1997). In other words, "[c]hanges in duties or working conditions that cause no materially significant disadvantage . . . are insufficient to establish the adverse conduct required to make a prima facie case." Harlston v. McDonnell Douglas Corp., 37 F.3d 379, 382 (8th Cir.1994). Here, there is no

evidence to suggest Hughes suffered a materially significant disadvantage by having to work more Sundays and Wednesdays or by having his performance reviewed by his subordinates. Therefore, we affirm the district court's holdings on these issues.

The district court concluded the remaining allegations, i.e., the four complaints and resulting investigations; loss of compensatory time; and failure to transfer Hughes to narcotics; were sufficient to allege adverse employment actions. On appeal, defendants do not contend these allegations are insufficient to satisfy the adverse employment action prong of Hughes's prima facie case. Thus, we assume, without deciding, that Hughes suffered an adverse employment action.

3.      Causation

The third and final element of Hughes's prima facie case is causation. To prove a causal connection under the third element, a plaintiff must prove an employer's retaliatory motive played a part in the adverse employment action. Kipp v. Mo. Highway & Transp. Comm'n, 280 F.3d 893, 896-97 (8th Cir. 2002). "[E]vidence that gives rise to an inference of a retaliatory motive on the part of the employer is sufficient to prove a causal connection." Id. at 897 (internal quotation marks omitted).

The district court concluded Hughes failed to make any showing of causation with respect to the loss of compensatory time because he presented no evidence of a Patrol policy allowing him to attend the training session out of uniform, and admitted he had no proof another trooper was not docked pay for attending out of uniform. As for the Patrol's failure to transfer him to narcotics, the district court noted Hughes failed to identify any of the persons involved in the decision making process and failed to offer any evidence showing the failure to transfer him was in any way related to his exercise of protected speech. On appeal, Hughes fails to address these issues.

Because Hughes offers no proof these employment actions were causally related to his speech, we affirm the district court's holdings.

As for the four complaints and investigations, the district court assumed for purposes of summary judgment Hughes had shown causation because they led to his demotion and transfer. Defendants argue the district court erred because there was insufficient evidence as to any of the defendants to show that pursuit of the four complaints and investigations was causally related to his exercise of protected speech.

     a.    Stottlemyre

Stottlemyre contends there is no evidence he was aware Hughes had spoken out against the consolidation plan, and therefore, there can be no inference of a causal connection between Hughes's speech and Stottlemyre's decision to demote and transfer him. Hughes, citing, among other cases, Darnell v. Ford, 903 F.2d 556, 561-62 (8th Cir. 1990), argues Stottlemyre was only sued in his official capacity as a representative of the Patrol and the Patrol can be held liable regardless of Stottlemyre's personal knowledge of Hughes's exercise of protected speech. We disagree.

"[I]t is well settled that § 1983 does not impose respondeat superior liability." Crawford v. Davis, 109 F.3d 1281, 1284 (8th Cir. 1997) (citing Monell v. Dep't of Soc. Servs. 436 U.S. 658, 691 (1978)), and nothing in the cases cited by Hughes changes this longstanding rule. For example, in Ford, a Missouri Highway Patrol Major (Ford) recommended Captain William Darnell be disciplined for failing to report misconduct by another patrol member. 903 F.2d at 557. Darnell sued, arguing Ford recommended discipline because Darnell opposed Ford's candidacy for patrol superintendent. Id. A jury found in favor of Darnell and awarded substantial damages. Id. On appeal, Ford argued the jury erred in finding causation because his recommendation was not directly responsible for Darnell's discipline. Id. at 561. Instead, the decision rested with the patrol superintendent. Id. at 561-62. This court

rejected Ford's argument, stating "causation can be established by direct personal participation in the deprivation or by participation setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict constitutional injuries on third parties." Id. at 562 (citing Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978)). Ford may be useful to Hughes in arguing his claims against Ellis, Ripley and Wilhoit, but it lends no support to his claim against Stottlemyre. We find the remaining cases cited by Hughes equally inapposite

.

        b.  Ellis/Ripley/Wilhoit

Hughes alleges Ellis and Ripley strongly favored the proposed consolidation plan, but when Hughes questioned its impact on public safety they were forced to reconsider the plan. Following the June 2003 meeting, Hughes alleges Ripley was visibly angry, and, when Hughes spoke with him several months later, Ripley continued to voice dismay at Hughes's opposition to the plan. Because of his unwillingness to accede to the plan, Hughes contends Ellis and Ripley began the campaign of retaliation outlined above, including their pursuit of the four complaints and investigations which led to his demotion and transfer.

Ellis and Ripley contend they played no part in initiating the complaints. Instead, their only role was to – in accordance with Patrol policy – sign the complaints which were initiated by Corporal Fisher. According to Ellis and Ripley, because the complaints were initiated by Fisher and investigated by Wilhoit, Hughes cannot show they set into motion the series of events which led to his demotion and transfer. As evidence, they point to a statement by Wilhoit indicating he discovered the information leading to the second and third complaints during an interview with Fisher conducted in connection with the first complaint.

Hughes disputes Wilhoit's version of those events, and offers a transcript of Wilhoit's interview of Fisher which contains no reference to the incidents involved in

the second and third complaints. He also disputes the usefulness of an affidavit prepared by Fisher which indicates Fisher was the source of the second and third complaints because it does not indicate to whom he reported the incidents.

Hughes also alleges the third complaint – involving Senator Caskey who had represented him in the first two complaints – was initiated to prevent Caskey from continuing to serve as legal counsel. As evidence the third complaint was fueled by an improper motive, Hughes states Caskey told him the Missouri Department of Revenue (MDOR) informed Caskey the license plates were the property of the state and could be seized by the Patrol. According to Hughes, he provided this information to Wilhoit during the investigation, but Wilhoit refused to contact Caskey or MDOR. Additionally, Wilhoit did not include this information in his report or inform Stottlemyre. Finally, Hughes alleges Wilhoit made unsubstantiated accusations of public corruption against Caskey, and, in an attempt to determine if Hughes had contacted Caskey, tried unsuccessfully to obtain Hughes's cellular telephone records without a subpoena or proper authorization.

Viewing all of the alleged actions in the light most favorable to Hughes, we are satisfied there is evidence suggesting a retaliatory motive on the part of Ellis, Ripley and Wilhoit, sufficient to prove a causal connection. Moreover, we reject the defendants' argument under Ford that any alleged wrongdoing did not cause or contribute to Hughes's demotion and transfer.

In Ford, Ford recommended Darnell be disciplined for his violation of patrol policy. Id. at 557. Later, Ford argued his recommendation did not cause Darnell's discipline because the final decision was made by the patrol's superintendent. Id. at 561-62. This court disagreed, finding ample evidence in the record to demonstrate the patrol's superintendent always followed recommendations for discipline. Id. at 562. Therefore, but for Ford's recommendation, Darnell would not have been disciplined.

-12-

Here, there is no evidence Hughes would have been demoted and transferred but for the four complaints. Assuming those complaints were initiated and pursued for retaliatory purposes, it is apparent Ellis, Ripley and Wilhoit "set[] in motion a series of acts by others which [they] knew or reasonably should know would cause others to inflict constitutional injuries on third parties." Id. (citing Johnson v. Duffy, 588 F.2d at 743). Accordingly, as to Ellis, Ripley and Wilhoit, we find Hughes has made out a prima facie showing of retaliation in violation of his First Amendment rights. As to Stottlemyre, we conclude Hughes has failed in his prima facie showing and affirm the district court's grant of summary judgment.

B.    Legitimate Non-retaliatory Reason/Evidence of Pretext

The district court found the Patrol had advanced a legitimate non-retaliatory reason for demoting and transferring Hughes because he admitted most of the underlying facts. It further concluded Hughes had presented no evidence suggesting the Patrol's reasons were a pretext for unlawful retaliation. On appeal, Hughes argues the district court's reasoning went beyond the arguments advanced by defendants in their summary judgment motion. Hughes contends the defendants only argued against his prima facie showing of retaliation and never discussed any legitimate non-discriminatory reasons for their actions. Accordingly, he contends the district court should have limited its analysis to the issues raised in the summary judgment motion to which he was given an opportunity to respond. Defendants concede they did not raise the issue in their motion for summary judgment. They contend, however, the district court's holding was no surprise to Hughes because their brief argued Hughes was terminated on the basis of the complaints, not for his speech.

Hughes should not have been required to anticipate the district court would grant summary judgment on a basis defendants admit was not raised. Therefore, we conclude the district court erred in granting summary judgment. Accordingly, we

-13-

reverse the district court's grant of summary judgment and remand for further proceedings.

## III

The judgment of the district court granting summary judgment in favor of Colonel Stottlmyre in his official capacity is affirmed. The judgment of the district court granting summary judgment in favor of Ellis, Ripley and Wilhoit is reversed, and the case is remanded for further proceedings.

COLLOTON, Circuit Judge, concurring in part and dissenting in part.

The court holds that this case must be remanded for further proceedings with respect to three of the four defendants because the district court granted summary judgment "on a basis defendants admit was not raised." *Ante*, at 14. I respectfully disagree with this conclusion, and I would affirm the judgment of the district court as to all of the defendants.

The court's decision is premised on Hughes's contention that in the district court proceedings, "the defendants only argued against his prima facie showing of retaliation and never discussed any legitimate non-discriminatory reasons for their actions." *Ante*, at 13. This assertion by Hughes is incorrect. The defendants argued in support of their motion for summary judgment that "[t]here is no dispute that Mr. Hughes was under investigation for serious violations of Patrol policy," (J.A. at 162), and that "[t]he uncontroverted material facts establish that it was this misconduct, and not a random comment by Mr. Hughes a year earlier at a private planning meeting, that resulted in Mr. Hughes being disciplined." (*Id.* at 163-64). The brief continued that "[t]he evidence is clear and unequivocal that the Plaintiff was demoted and transferred by Stottlemyre because he engaged in serious misconduct, based on what

-14-

Mr. Hughes admitted he did." (*Id.* at 164). That these arguments appeared under a heading asserting "[n]o causal connection" did not delimit the argument to a refutation of the plaintiff's prima facie case. "Causal connection" is a necessary element of *the claim*, not merely of a prima facie case, *see Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004), and the defendants' brief in the district court never restricted its argument to defeating a prima facie case.

On behalf of defendant Ripley, the brief filed in the district court disputed Hughes's theory that he was targeted for discipline because he disagreed with Ripley. The brief argued that "Plaintiff's habit of misconduct and laziness were altered upon the arrival of a new corporal, Kevin Fisher," that "Fisher reported Plaintiff's misconduct," and that Ripley signed the complaints "because he was Plaintiff's supervisor, and he was told to sign by Professional Standards." (J.A. at 165-66). With respect to defendant Ellis, the brief likewise argued that he signed a complaint that "was generated by Corporal Fisher, who objected to Plaintiff entering his residence without authorization," and that Hughes's efforts to justify his actions were largely irrelevant, because "what is determinative is that Fisher initiated the complaints against Plaintiff." (*Id.* at 166-67 & n.6). As for defendant Wilhoit, the brief urged that Hughes's speech was not "a motivating factor in Wilhoit's actions because Wilhoit was unaware of that activity." (*Id.* at 168).

Not surprisingly, Hughes responded to these arguments by attempting to generate a factual dispute concerning whether he was really demoted and transferred for misconduct and violations of patrol policy. He argued that "[i]n their efforts to pin the investigation of those incidents on Fisher, and thereby shield themselves from responsibility, defendants lied." (*Id.* at 283). He asserted that "[t]he Patrol did not discipline others as harshly," and attempted to marshal evidence of similarly situated employees who were punished less severely for actions that Hughes asserted were comparable. (*Id.* at 284-85). Hughes's argument regarding Ripley, Ellis, and Wilhoit sought to question the credibility of their explanations. (*Id.* at 287-88).

-15-

The district court did not abuse its discretion in organizing these arguments under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Graning v. Sherburne County*, 172 F.3d 611, 615 (8th Cir. 1999) (applying *McDonnell Douglas* to § 1983 First Amendment claim). The *McDonnell Douglas* method was "never intended to be rigid, mechanized, or ritualistic," *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577 (1978), and there is no requirement that parties use "magic words" to express their argument that the evidence generates no genuine issue of fact for trial. The substance of the arguments presented to the district court involved whether Hughes was demoted and transferred for a legitimate reason independent of his allegedly protected speech. With respect, the "admission" made by the appellees concerning their filings in the district court will not bear the weight assigned to it by the court. While the appellees "admit that they did not state their position *in the same language* as that used by the District Court," they assert it is "untrue and unfair to assert that the District Court's analysis was a surprise to the Appellant." (Br. of Appellees at 22) (emphasis added). The brief of the appellees devotes five pages to demonstrating how the issue whether the defendants acted against Hughes for a legitimate reason was indeed fully aired before the district court.

The court's opinion, finding that Hughes has satisfied the "low threshold" of a prima facie case, *see Rodgers v. U.S. Bank*, 417 F.3d 845, 852 (8th Cir. 2005), should not preclude the defendants on remand from pursuing a renewed motion for summary judgment based on the contention that Hughes did not engage in protected activity, *see Garcetti v. Ceballos*, 126 S. Ct. 1951 (2006), or that Hughes was demoted and transferred for legitimate reasons. *See Hudson v. Norris*, 227 F.3d 1047, 1051 (8th Cir. 2000) (providing that although court would not consider arguments raised for the first time on appeal, "defendants may raise these issues on remand in a renewed motion for summary judgment, or at some other appropriate juncture, if they wish"). Because I find no procedural error by the district court, however, I would reach the merits and affirm the district court's conclusion that there is no genuine issue of fact for trial. Even assuming that Hughes engaged in protected speech, he

admitted the misconduct underlying the disciplinary complaints that led to his demotion and termination. He failed to produce evidence of similarly-situated employees who were treated differently, and it is undisputed that complaints by Corporal Fisher were the catalyst for the disciplinary complaints against Hughes. It is further undisputed that Lieutenant Wilhoit concluded two investigations, substantially completed a third, and received the assignment for a fourth before he was even aware of Hughes's alleged protected activity. For the reasons stated in the district court's thorough opinion, I would affirm the judgment dismissing the complaint. *See Hughes v. Stottlemyre*, No. 04-4053, 2005 WL 1279027 (W.D. Mo. May 27, 2005).

_____